UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PETER COCCARO, | : | CIVIL ACTION NO. 3:03CV914 (DJS) |
| : | | |
| Plaintiff, | : | |
| v. | : | |
| : | | |
| AT&T CORPORATION, | : | |
| : | | |
| Defendant. | : | MARCH 26, 2004 |

## LOCAL RULE 56(a)(1) STATEMENT OF UNDISPUTED FACTS

1. On June 25, 2001, AT&T hired the plaintiff, who was then 58 years old, as an Account Executive-Voice in AT&T's Business Services Organization in Norwalk, Connecticut. (Complaint, ¶ 9; Answer, ¶ 9).[1]

2. The plaintiff, born November 3, 1942, held that position until January 10, 2002. (Complaint, ¶ 26).

3. As an account executive, the plaintiff's primary responsibility was to increase AT&T's revenue through sales to businesses in a specific territory of AT&T "voice" products, such as local telephone service, long distances service, calling cards, and teleconferencing. (Deposition of Peter Coccaro (hereinafter "Coccaro Dep.") at 56).[2]

4. John Swarts hired the plaintiff and was his manager until mid-September 2001, when Joseph LaCroce assumed responsibility for managing the plaintiff and the other seven account executives in AT&T's Norwalk office. (Coccaro Dep. at 78).

---

[1] The Complaint is attached to the Memorandum of Law in Support of Defendant's Motion for Summary Judgment as Exhibit A. The Answer to the Complaint is attached to the Memorandum of Law as Exhibit B.

[2] Excerpts from the deposition of the Plaintiff, Peter Coccaro, that are referred to in the Memorandum of Law and herein are attached as Exhibit C to the Memorandum of Law.

41489766_2.DOC  003338-00070

5.  In September, shortly after the plaintiff had completed training, AT&T instructed the plaintiff to assume responsibility for Virginia Trinque's module of accounts, because Trinque was on extended sick leave. (Coccaro Dep. at 80-81, 238).

6.  A "module" is a group of base accounts that is sometimes, though not always, given to new account executives after initial training. (Coccaro Dep. at 76-77; Deposition of Joseph LaCroce (hereinafter "LaCroce Dep.") at 42).[3]  Account executives use their module of accounts to make sales and to identify additional sales opportunities. (Coccaro Dep. at 86, 182.)

7.  The plaintiff testified that Trinque "notified everyone to notify that I would be fully in for her," and that she provided her module contacts with the plaintiff's phone number. (Coccaro Dep. at 81).

8.  The plaintiff treated the module as his own, and tried to book business from Trinque's accounts. (Coccaro Dep. at 126-27, 134).

9.  To monitor the plaintiff's work on the module, in an October 23, 2001 e-mail, LaCroce asked the plaintiff: "[w]hat accounts have you penetrated since you have taken over Virginia's module." (Coccaro Deposition Exhibit (hereinafter "Dep. Exh.") 5).[4]

10. The plaintiff's sales results were unsatisfactory virtually from the start. (Coccaro Dep. at 123).

11. On October 26, 2001, LaCroce met with plaintiff regarding his lack of sales performance and identified areas in which his performance needed to improve. (Coccaro Dep. at 123-25).

---

[3] Excerpts from the deposition of Joseph LaCroce that are referred to in the Memorandum of Law and herein are attached as Exhibit D to the Memorandum of Law.

[4] Coccaro Deposition Exhibit 5 is attached to the Memorandum of Law as Exhibit E.

12.     During this meeting, LaCroce and the plaintiff developed an informal "action plan" for the plaintiff to improve his job performance. (Coccaro Dep. at 125-126; Coccaro Dep. Exh. 6).[5] This plan called for the plaintiff to meet his quota, to increase the number of proposals made to potential customers, to place all proposals in to the "funnel" for review, and to set up face-to-face visits (or "premise visits") with existing customers in an effort to identify other sales opportunities. (Coccaro Dep. Exh. 6).

13.     The "funnel" is essentially a database which contains a list of prospective customers identified by an account executive, with corresponding dollar amounts estimating the sales potential of each listed customer. The number and dollar value of prospects then shrinks as time passes and customers are less likely to purchase AT&T services. The funnel is maintained so that an account executive will have enough potential prospects identified such that selling to a small percentage of these prospects results in meeting quota. (Coccaro Dep. at 90-94.)

14.     Approximately two weeks later, seeing no improvement at all in the designated areas, LaCroce met with the plaintiff again and placed him on a Level A Performance Improvement Plan ("PIP"). (Coccaro Dep. Exh. 7).[6]

15.     In the PIP, LaCroce identified three particular deficiencies requiring improvement. (Coccaro Dep. Exh. 7). Specifically, LaCroce noted that the plaintiff had failed to: 1) close a single sale during his time at AT&T; 2) identify and enter a sufficient number of opportunities into his funnel; and 3) maintain a minimally acceptable number of weekly contacts or premise visits to customers. (Coccaro Dep. Exh. 7).

---

[5] Coccaro Deposition Exhibit 6 is attached to the Memorandum of Law as Exhibit F.

[6] Coccaro Deposition Exhibit 7 is attached to the Memorandum of Law as Exhibit G.

16.     The plaintiff did not at the time, nor has he since, disputed the veracity of LaCroce's observations about his sales performance and activities in the first PIP. (Coccaro Dep. at 136-38).

17.     LaCroce gave the plaintiff 30 days to meet the requirements of the Level A PIP. (Coccaro Dep. at 142-143; Coccaro Dep. Exh. 7). Consistent with general AT&T policies, if his performance did not improve, at the end of thirty days, the plaintiff would be placed on a Level B PIP. (Coccaro Dep. at 142-143; Coccaro Dep. Exh. 7).

18.     As LaCroce explained to the plaintiff, the standard terms of a Level B PIP would require that the plaintiff either: 1) accept a 30-day job search period, at the end of which his employment would be terminated if he had not by then secured another position; or 2) accept another 30-day PIP, at the end of which his employment would be terminated unless he succeeded in meeting minimally satisfactory standards. (Coccaro Dep. at 142-143).

19.     Over the course of the first PIP, the plaintiff made only $2,400 worth of proposals, which fell short of the $18,000 minimum standard. (Detailed Observations on Performance, hereinafter "Detailed Observations").[7] Also, the plaintiff made just one sale totaling only $1,000, which was $5,000 short of his goal. (Detailed Observations). By the plaintiff's own admission, in his more than six months of employment at AT&T, he made only one sale. (Coccaro Dep. at 95-96).

20.     Because the plaintiff had failed even to approach the goals set out in the Level A PIP, LaCroce placed him on the Level B PIP. (Detailed Observations; Coccaro Dep. Exh. 8).[8]

---

[7] The document entitled "Detailed Observations on Performance" is attached to the Memorandum of Law as Exhibit H.

[8] Coccaro Deposition Exhibit 8 is attached to the Memorandum of Law as Exhibit I.

LaCroce met with the plaintiff on December 10 to again explain to him his options under the Level B PIP. (Coccaro Dep. at 146).

21. At that time, the plaintiff opted to accept the 30-day job search, at the end of which AT&T would terminate his employment if he had not yet secured another position. (Coccaro Dep. Exh. 8).

22. Other employees in the plaintiff's division who were younger than the plaintiff were similarly treated with regard to unsatisfactory sales performance. (LaCroce Dep. at 143, 157). For example, AT&T placed John Cibulay, age 44, on several written warnings due to his inadequate performance. (Action Plans for John Cibulay, hereinafter "Action Plans").[9] In fact, AT&T placed Cibulay on three sequential PIPs. (Exhibit J, Action Plans; LaCroce Dep. at 143). AT&T afforded Cibulay multiple opportunities to improve his performance both because he had been with the company more than six months, and because at times he was able to meet certain minimum sales targets. (LaCroce Dep. at 143-144). Cibulay's inability to sustain adequate sales performance, however, ultimately led to AT&T's decision to terminate his employment. (LaCroce Dep. at 142-43).

23. All employees with unsatisfactory sales performance were placed on formal action plans or PIPs. (LaCroce Dep. at 106).

24. Pursuant to AT&T's general policy, individuals employed by AT&T for more than six months may be put on action plans rather than PIPs. AT&T employees holding their jobs for less than that amount of time go directly to a Level A PIP. (AT&T Performance Improvement Policy).[10]

---

[9] Cibulay's Action Plans are attached to the Memorandum of Law as Exhibit J.

[10] AT&T's Performance Improvement Policy is attached to the Memorandum of Law as Exhibit K.

25. The plaintiff has never maintained that LaCroce or any other AT&T employee made any remarks about the plaintiff's or any other employee's age, nor that any AT&T employee ever stated or implied that age was the reason for his termination or poor performance reviews. (Coccaro Dep. at 160, 170).

26. LaCroce arranged for Hugh Sullivan, a four-year AT&T employee with sales experience, to transfer into LaCroce's group effective December 23, 2001 to fill one of the two openings on the sales team that existed *while the plaintiff was still employed by AT&T.* (LaCroce Dep. at 153-55).

>                                   DEFENDANT,
>                                   AT&T CORPORATION
>
>
>                                   By_____
>                                       Victoria Woodin Chavey (ct14242)
>                                       Stacy Smith Walsh (ct25252)
>                                       Day, Berry & Howard LLP
>                                       CityPlace I
>                                       Hartford, Connecticut 06103-3499
>                                       (860) 275-0100
>                                       (860) 275-0343 (fax)
>                                       *vwchavey@dbh.com*
>                                       *sswalsh@dbh.com*
>                                       Its Attorneys

**CERTIFICATION**

    THIS IS TO CERTIFY that a copy of the foregoing was mailed this date via first-class mail to:

Robert A. Richardson, Esq.
Garrison, Levin-Epstein, Chimes
  &amp; Richardson
405 Orange Street
New Haven, CT 06511

                                                  _____
                                                         Stacy Smith Walsh