Page 125

1    discussion with Joe?  Did he think you were in great
2    shape on that?
3         A.   I imagine -- well, I don't remember exactly
4    everything that transpired.  I know that there were
5    areas that say, well, things need to be picked up in
6    this area.
7         Q.   In that area specifically, activity starts?
8         A.   Well, if I recall, I probably addressed
9    Virginia's module accounts.  In other words, he says,
10   "Take it over."
11             And I says, "You maybe in your mind have taken
12   them over, but they are still not" -- "don't have my
13   name on the database."
14        Q.   Did you tell him that?
15        A.   Yes, I believe I did.
16        Q.   What did he say?
17        A.   "Well, it takes time to get that brought
18   over."  There were some that were.  Depending where they
19   are in that database, I could access it and do it.  So
20   now at this point, I say, "Well, if I am going to be
21   doing this, I put my name on it, but I don't know if I
22   was kept."
23             Some days you make changes, and you look the
24   next day, and it is not there.  There are others there
25   you couldn't change because of where they were in the

1  cycle.
2      Q.  At this point it is pretty clear that Virginia
3  is going to be out for a while; is that correct?
4      A.  It didn't look like she was coming back right
5  away because she had surgery.  It was going to be a bit
6  longer.
7      Q.  At that point, even Joe was referring to you
8  having taken over Virginia's module.  Did you feel at
9  that point that it was yours?
10     A.  No.  That is why I discussed it with them.
11 When you say "take over her module," no one officially
12 said, "You have officially taken over Virginia's
13 module."  If and when she comes back -- at least to the
14 best that I can recall, if and when she comes back, she
15 will start from scratch or you will turn over the things
16 back to her.
17     Q.  No one ever explained what would happen when
18 she came back to you?
19     A.  No.  It was all -- it was all, you know,
20 undefined.  As far as I remember, it was all undefined.
21 It was, "Well, you know, if you do, at the close of
22 business, we can give you credit for it."  But am I
23 going to have it, am I not going to have it, it was
24 never --
25     Q.  Were you acting as though that was your model?

1    A.   There comes a point in time when you need to
2    get the activity.  You need to get business.  You are
3    just going to do it for survival.  No one is going to
4    say to you, "You know, Pete, you shouldn't have booked
5    that business.  Virginia is not here."
6         Book the business, like I said before.  If you
7    are worried about who gets compensated later -- because
8    then if somebody is going to get the commission of
9    something you sold, and it is not even going to show up
10   in your sold column, then you have good reason to say,
11   "How come this doesn't show up?"
12   Q.   Did he go over with you in this meeting how
13   you could achieve -- how he could help you achieve or
14   how you could achieve the targets that he wanted you to
15   achieve?
16   A.   He didn't go over what -- no, he went over
17   what you need to get to, you know, the dollar amounts.
18   Q.   Do you remember what dollar amounts he told
19   you you needed to get to?
20   A.   I don't recall.
21   Q.   Were you surprised at the dollar amounts he
22   told you you had to get to?
23   A.   I don't think I would have been.
24   Q.   Why not?
25   A.   If that is what I had to do, that is what I

```
 1   that I need to do.
 2        Q.   Did you think that was too much for him to
 3   ask?
 4        A.   Based upon what I know about it, as I was
 5   learning the business then -- of course, what I know now
 6   about the cycle and finding the prospects and finding
 7   the prospects that aren't on the contract to another
 8   customer, yes.  It was pretty -- to propose $18,000
 9   worth of business is -- now, you may walk into a company
10   like Stolt Nielsen and easily triple that amount because
11   of the amount of opportunity there, if there was such an
12   opportunity, but starting out from scratch.
13        Q.   You write, "Prem. visit accounts in module to
14   discuss the above."  What does P-R-E-M mean?
15        A.   Premise.  In other words, face-to-face, as
16   opposed to telephone.
17        Q.   During the weeks following your October 26
18   meeting with Joe, did you do these things listed?  Did
19   you plan 18 Local & TC proposals?
20        A.   Actually, I did plan them.  Did I hit 18, I
21   don't recall if I hit 18.  I may have.  I may have hit
22   more.
23        Q.   Did you do a premises visit of the accounts in
24   the module?
25        A.   Yes.
```

1    Identification - described in Index.)

2        Q.    I ask you to take a look at Defendants'
3    Exhibit 7 and tell me if you recognize that document.
4        A.    I do.
5        Q.    Can you identify it for the record?
6        A.    It is a Performance Improvement Plan.
7        Q.    This was the one you referenced in response to
8    the earlier question about the next time you spoke with
9    Joe about your performance issues?
10       A.    Yes.
11       Q.    On the first page, it lists areas needed
12   improvement, sales closed in a 30 day-period.  Had you
13   discussed this issue with Joe prior to seeing this
14   Performance Improvement Plan?
15       A.    Yes.
16       Q.    Do you remember, when did you discuss it?
17       A.    Probably one of these other meetings, probably
18   at this one.
19       Q.    Do you disagree that -- is it incorrect to say
20   that you had not closed any sales in that period of
21   time?
22       A.    No, it is correct.
23       Q.    Is it correct to say that there were
24   insufficient opportunities identified and entered into
25   your funnel?

1      A.   That is hard to answer because I don't know
2  what would have been considered sufficient.  I mean,
3  was I one shy, was I a hundred shy.
4      Q.   Did you talk to Joe specifically in the
5  October 26 meeting, for example, about the opportunities
6  listed in your funnel?
7      A.   I don't recall any discussion about, "You are
8  close but not quite there," or "You should have twice
9  what you have in there," or something like that.  I
10 don't recall any discussion about the number of
11 opportunities other than he talks about because of the
12 close ratio of 30 percent.
13     Q.   Was that a typical -- the 30 percent close
14 ratio, was that a typical ratio put onto people's
15 funnels?  In other words, was it consistent across
16 the --
17     A.   I don't know.  That is a number he came out
18 with.  I wish I could have closed 30 percent of my
19 opportunities.
20     Q.   Had you discussed before seeing this
21 Performance Improvement Plan that your activity level on
22 a weekly basis wasn't up to minimum standards?
23     A.   Not that I recall.
24     Q.   When you saw this Performance Improvement
25 Plan, did you tell Joe that you -- whether you had any

1  issues with Number 2 or Number 3 under areas that need
2  improvement?  Did you tell him you disagreed?
3      A.   I didn't think that that was -- no, I didn't
4  tell him I disagreed because that was not the time to do
5  it.
6      Q.   Why didn't you think it was the time to do it?
7      A.   I would venture to say that if I said I
8  disagreed with this, he would say, "Here is the door."
9      Q.   When you met with him on October 26 -- if you
10 want, you can take a look at Defendants' Exhibit 5 to
11 refresh your recollection.  It is the last one there.
12 It is on the bottom. It is on the bottom of that.
13     A.   Bottom of this one, here it is.
14     Q.   When you were discussing the issues he lists
15 in this e-mail, did you tell him whether you disagreed
16 or thought his expectations were inappropriate or
17 unrealistic, given your short period of time at the
18 company, or anything like that?
19     A.   I think I recall mentioning something about,
20 "I don't think I have entered everything into the
21 system, and because I hadn't talked to the customer, and
22 you know, honestly qualified it" -- I said, "but you
23 could have filled it up with, you know, some activity."
24     Q.   That wasn't qualified?
25     A.   That wasn't qualified, but that is not what I

Page 142

1  Q. When did you learn about the lead time into
2  that?
3  A. When I saw the order at ATMI and saw all the
4  paperwork I have to fill out and said, "Oh, no, this is
5  just the start of it," he says, "Now, if everything is
6  done correctly and there are no bumps along the way,
7  then it goes through the system, and it takes this long.
8  If there is any bumps, it goes back, and you start all
9  over again."
10      So it is -- it is a lengthy process.
11  Q. Is that your signature in the middle of the
12  page there?
13  A. Yes, it is.
14  Q. Did you sign it in front of Joe?
15  A. Yes, I did.
16  Q. The third page of the document also identified
17  some of the same issues that are listed on the first
18  page, sales closed, insufficient opportunities, and
19  activity level. Did Joe explain to you the 30-day
20  window of time you had to achieve these objectives?
21  A. Yes.
22  Q. Did you understand that at the end of those 30
23  days, you would then have an option to take another 30
24  days to try and get it done or to take 30 days to find
25  another job?

1   A.   Yes.  He also explained to me that if I did go
2   to Plan B, that an additional amount of revenue would go
3   on top of it, and the number would go from 8,000 to
4   something like 11 or 13,000.
5   Q.   You mean from 6,000 to --
6   A.   Or from whatever December, November was.
7   Q.   So it would just add on the December amount,
8   which would make it 12 probably, because it was 2, 4, 6?
9   A.   Something like that, yeah.  So he says, "You
10  are looking at this number, and you see you got another
11  30 days to do it.  But," he says, "keep in mind that
12  number gets bigger."
13  Q.   What was your response to that?
14  A.   I am saying to me that he is doubting that it
15  can be done.
16  Q.   After this November 9th meeting, what steps
17  did you take to try and meet these objectives?
18  A.   I tried to all-out push for the customers that
19  I was able to get in touch with and saw an opportunity
20  to get some proposals in front of them and to try to get
21  the proposals in front of them.  I mean, for the first
22  30 days, I said, "Let's see what I can do."  But you are
23  getting into a period with holidays, Thanksgiving.
24  Q.   So you weren't -- were you not very successful
25  in getting some proposals put together?

```
 1      A.   I was not successful in getting enough
 2 proposals.
 3      Q.   Did you get any proposals?
 4      A.   I am trying to think of one that I was working
 5 on, if it was at that period or was that earlier, and I
 6 really don't recall.
 7      Q.   You say that a fellow employee in the office,
 8 John Cibula, also didn't have any sales closed during
 9 the same time period?
10      A.   Yes.
11      Q.   How do you know that?
12      A.   Because he came into -- first of all ,I know
13 he had no sales.  He mentioned that he hadn't closed any
14 business yet.  When he came into the meeting, when he
15 picked up his first order, he said, "It feels good to be
16 out of the zero column."
17      Q.   When was that meeting?
18      A.   It was right before I was -- September,
19 October, in that time frame.
20      Q.   Did he make any other sales that you are aware
21 of while you were there?
22      A.   Not that I was aware of.
23      Q.   Where did you and Joe meet to go over this
24 Performance Improvement Plan?
25      A.   In his office in Norwalk.
```

1   gun to your head, no.
2       Q.   So you were getting the same number of cold
3   calls and same number of prospects that you were before
4   the performance plan after the performance plan?
5       A.   Right, but it was not just as relaxed about
6   the whole situation anymore.  It was a lot more tense.
7       Q.   Did you tell anyone at AT&T that you thought
8   the Performance Improvement Plan was unreasonable or
9   that some of the objectives would be impossible to meet?
10      A.   I don't recall.
11      Q.   30 days go by, and the objectives aren't met,
12  correct?  And did Joe schedule a meeting with you to go
13  over the next steps?
14      A.   Yes.
15      Q.   What did he say when he scheduled that meeting
16  with you?
17      A.   He says, "Well, it is December 10th.  You
18  didn't meet the guidelines of Performance Improvement
19  Plan, part A.  I need to know what your decision is."
20      Q.   Was there any substantive discussion about how
21  close you had come or whether you had partially met them
22  or anything to that effect?
23      A.   No.  He just said, "You didn't meet what was
24  required."  At least that is what I remember him saying,
25  that you didn't meet what was required in it and you

Page 157

```
 1  next to John Cibula's name.  Do you see that?
 2      A.   Yes.
 3      Q.   Did you draw that?
 4      A.   It may have been drawn by the firm in
 5  New Jersey -- in Long Island.
 6      Q.   You have no recollection of drawing it
 7  yourself?
 8      A.   No.  I may have, but may have in the paperwork
 9  I gave them, the statements I gave them.  They may have
10  gone through this.
11           Could I speak with --
12      Q.   Would you like to take a break?
13      A.   Yes.
14      Q.   Sure.
15                (Recess: 3:00 to 3:08 p.m.)
16      Q.   Mr. Coccaro, are there any answers to any of
17  your prior questions you want to change, now that you
18  are back from your break?
19      A.   Well, you asked how many people I spoke to.
20  Of course, I spoke to Joe too, to get the --
21      Q.   Okay, gotcha.  Anything you recall now that
22  you haven't recalled earlier in the deposition other
23  than the fact that you spoke to Joe?
24      A.   Well, thinking about a question you asked
25  earlier, you know, of course, things are running through
```

1    A.    Not that I can recall right now.

2    Q.    If you had to identify a person at AT&T who is
3    responsible for those things, or more than one person,
4    who would that person be?

5    A.    I would just be guessing. I mean, I don't
6    know if it came down, or this is what I wanted to do.
7    It is my group. I am going to do it this way.

8    Q.    Did you ever have an interaction with anyone
9    at AT&T where in the moment, at the time, you felt they
10   were treating you differently or unfairly because of
11   your age?

12   A.    The fellows I worked with?

13   Q.    Anyone at AT&T?

14   A.    I am going to ask you to repeat that. I'm
15   sorry.

16   Q.    Sure. Can you identify a person that you were
17   talking to or meeting with or working with who at the
18   moment, at that instant you were talking to them, you
19   felt they were treating you differently because of your
20   age, a specific meeting or a specific incident, a
21   specific statement, anything like that?

22   A.    I would say if I had to go back at that time,
23   at that moment -- because you used the words "at that
24   moment" -- I would say no. Rather than jump to
25   conclusions, things developed, and opinions and results

COCCARO VS. AT &T CORP.                                January 21, 2004

Page 170

```
 1   used to be, running around the territory."
 2       Q.   Did she tell you any anecdotes or stories
 3   about things people had said to her about --
 4       A.   No.
 5       Q.   Other than what you learned from that employee
 6   or any other employees at a meeting at the law firm on
 7   Long Island, did you ever hear anyone in the Norwalk
 8   office say anything that sounded like discrimination
 9   based on age?
10       A.   Not that I recall.  I didn't hear anything.
11       Q.   Do you have any -- what other information do
12   you have to support your opinion that you haven't
13   already shared with me that you were discriminated
14   against because of your age?
15       A.   The 550 applications that he had that are all
16   related to similar complaints.
17       Q.   Who is "he"?
18       A.   The attorney at Leeds, Morelli & Brown.
19            MR. RICHARDSON: Haven't seen them.
20       A.   We weren't allowed to look at them either,
21   because obviously, they are proprietary information.  I
22   am sure my application --
23            MR. RICHARDSON: That is enough.  I was
24   just making a clarification.
25       Q.   Was that meeting in New York with Leeds,
```

SANDERS, GALE & RUSSELL                                (203)624-4157

Page 182

1    Q.   If you could turn to page 3, and let me direct
2  your attention specifically to paragraph 15.  Would you
3  take a moment to read that?
4    A.   I did.
5    Q.   Did anyone else in the office, in the Norwalk
6  office, complete a training program about the same time
7  you did, maybe a few months before, a few months after?
8    A.   Well, a few months before John did.
9    Q.   Did John have a module, as far as you know?
10   A.   Yes.
11   Q.   Do you know who assigned that module to him?
12   A.   I would only be able to guess and say his
13 manager at the time, which is probably John Swarts.
14   Q.   If an account executive had a module, what
15 were they responsible for doing with that module?
16   A.   Growth, grow the business.
17   Q.   With respect to each customer?
18   A.   Yes.
19   Q.   If you were an account exec and you had a
20 module, and you went out and got a new customer that
21 wasn't in the system or in your module, would that
22 customer be added to your module?
23   A.   Yes.  They wanted that too.
24   Q.   Do you know how the modules were set up, how
25 the groups were decided on, groups of customers?

COCCARO VS. AT &T CORP.                         January 21, 2004

Page 238

```
 1   accounts and so forth, and asked about it, when I said,
 2   "How about this one," so forth.
 3       Q.   I guess -- let's try and get a better
 4   estimate.  When would you have been going over certain
 5   accounts with John -- I mean with Joe?  I'm sorry.
 6       A.   Probably sometime after -- of course, after he
 7   took over the group, probably subsequently after that
 8   October meeting.
 9       Q.   Could it have been in that October meeting?
10       A.   Possibly.  I don't know if we specifically
11   discussed specific accounts at that time.  There may
12   have been other less formal meetings, just going over
13   some things.
14       Q.   Once you knew that Virginia was going to be
15   out for many months, much longer than originally had
16   been assumed, did you go back to anyone and say, you
17   know, "Are these mine now, and I can just run with
18   them," or did anyone tell you that?
19       A.   No one specifically told me that they would
20   all be cut over to me.  "We will work on a transition."
21       Q.   That is what someone said to you?
22       A.   That is what Joe said to me.  "We are working
23   on a transition to move," but didn't say "all."
24       Q.   Was it common for customers to get moved
25   around from module to module?
```