LEXSEE 1995 US DIST LEXIS 10720

**JAMES R. ELLIS, Plaintiff,-against-PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY AND PROVIDENT LIFE & CASUALTY INSURANCE COMPANY, Defendants.**

91 Civ. 7074 (JFK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1995 U.S. Dist. LEXIS 10720*

**July 31, 1995, Decided
August 1, 1995, FILED**

**LexisNexis (TM) HEADNOTES- Core Concepts:**

**COUNSEL:** [*1] For Plaintiff: Liddle, Robinson & Shoemaker, 685 Third Avenue, New York, New York 10017, Of Counsel: Jeffrey L. Liddle, Esq., W. Dan Boone, Esq., James A. Batson, Esq..

For Defendants: Taft, Stettinius & Hollister, 1800 Star Bank Center, 425 Walnut Street, Cincinnati, Ohio 45202-3957, Of Counsel: J. Alan Lips, Esq., Thomas J. Sarakatsannis, Esq.. Provident Life & Accident Insurance Company and Provident Life & Casualty Insurance Company, One Fountain Square, Chattanooga, Tennessee 37402, Of Counsel: J. Hartly Echerd, Esq.. Friedman & Kaplan, 875 Third Avenue, New York, New York 10022-6225, Of Counsel: Robert D. Kaplan, Esq..

**JUDGES:** JOHN F. KEENAN, United States District Judge

**OPINIONBY:** JOHN F. KEENAN

**OPINION:**

### OPINION AND ORDER

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Defendants' motion for summary judgment seeking dismissal of Plaintiff's Complaint, pursuant to *Fed. R. Civ. P. 56*. Plaintiff also cross-moves for partial summary judgment. For the reasons that follow, Defendants' motion is denied in part and granted in part. Plaintiff's cross-motion is denied.

### BACKGROUND

Plaintiff James R. Ellis ("Ellis"), born on August 4, 1938, is a [*2] resident of the State of New York. Defendants Provident Life & Accident Insurance Company ("Provident Life & Accident") and Provident Life & Casualty Company ("Provident Life & Casualty") are private corporations that have their principal place of business at One Fountain Square, Chattanooga, Tennessee, 37402. Provident Life & Casualty is a wholly owned subsidiary of Provident Life & Accident. Provident Life & Casualty is licensed to sell insurance in the State of New York, and its Accident Department sells and services individual disability income insurance policies. The Accident Department maintains five offices in New York. Provident Life & Accident and Provident Life & Casualty will be collectively referred to as "Provident."

In 1967, Provident Life & Accident hired Ellis in its New Orleans office. Ellis remained there until 1972 when he became the Branch Manager of Provident Life & Casualty's Accident Department for the New York metropolitan area. The branch office consisted of all of New York state south of the metropolitan Albany area to the New York/New Jersey border, including the five boroughs of New York City, Westchester County, and all of Long Island. As branch manager, [*3] Ellis exerted exclusive control over all operations of the New York branch office.

Ellis's compensation consisted of a base salary of $95,000 and commissions generated from all sales and renewals of individual disability income insurance policies in his territory. The base salary constituted a floor beneath which a branch manager's salary could not fall. Commissions constituted the bulk of a branch manager's compensation. The branch manager received a percentage of all policies sold and renewed in his territory. Therefore, as sales and renewals increased, the branch manager's commissions grew, and there was no limit to how much a successful branch manager could earn.

As the New York branch manager, Ellis consis-

tently rated as one of the top producers in the Accident Department. In 1972, when Ellis began as branch manager, the New York territory had in-force premiums of $960,747.00. Under Ellis's management, the New York branch's in-force premiums grew to $24,272,444.00 by 1990. The Long Island and Westchester territories accounted for $7,376,574.00 of that amount.

Since Ellis's compensation directly correlated to his territory's success, his compensation greatly increased during [*4] his tenure. During the late 1980s revenues from sales and renewals of disability income insurance policies grew at an average rate of 10% per year. Accordingly, from 1987 to 1990, Ellis's compensation increased from $400,000 in 1987, to $500,000 in 1988, to $550,000 in 1989, and to $600,000 in 1990.

In early 1991, Provident advised Ellis that the New York territory would be split. On July 31, 1991, the Westchester and Long Island territories were assigned to another branch manager 16 years Ellis's junior. Ellis alleges that Provident violated the Age Discrimination in Employment Act, *29 U.S.C. § 621* et seq., ("ADEA") and the New York age discrimination statute, *New York Executive Law § 296*, when it split his territory and replaced him with a younger person.

Ellis argues that the branch office split constitutes a demotion. According to Ellis, the split drastically reduced his compensation because it deprived him of valuable commissions. The split also blocks Ellis from the opportunity to increase sales in a rapidly growing market. Ellis contends that the New York branch office split is part of Provident's plan to eliminate the jobs of its older branch managers and to replace [*5] them with younger managers. The plan sought to reduce older branch managers' compensation and create oppressive working conditions to force the managers to leave their jobs. Ellis claims that Defendants initiated the plan in 1988 by splitting the size of older branch managers' sales territories, and in some instances, closing particular offices.

Ellis also alleges that Provident instituted a new compensation system in 1992 that detrimentally affected older branch managers. The 1992 plan stressed the quality of the policies sold and renewed rather than simply the number of policy sales and renewals. Thus, older branch managers with large sale and renewal figures could not earn the same commissions as under the previous plan. Coupled with the division of territories, the new compensation system further decreased older branch managers' compensation. Ellis asserts that Provident intentionally adopted the plan to force older branch managers to retire.

Provident denies that age played a motivating role in the decision to split the New York territory. Provident claims that during the Fall of 1990, Ralph J. Christiana ("Christiana"), the Accident Department Manager, decided to split the [*6] New York territory, because he determined that the New York region could be more efficiently managed and developed if another branch office serviced part of the territory. Therefore, Christiana created the Long Island/Westchester branch office. Provident asserts that such a split should not have surprised Ellis because ten of Provident's thirteen competitors in the New York region maintained separate New York and Long Island branch offices.

Furthermore, Provident argues that age did not play a role in splitting the territory because they offered the Long Island branch manager job to 48-year-old Eugene McCarthy. McCarthy was the New York branch manager for the Monarch Life Insurance Company ("Monarch"). After receiving a firm offer from Provident, McCarthy toured the Long Island territory and selected a new office location and office furniture. Provident assumed that McCarthy would accept the offer. However, in late May 1991, McCarthy declined the offer. Provident claims that McCarthy rejected the offer because the two parties disagreed over management philosophy, and because Defendants refused to provide sufficient health insurance to McCarthy's former wife and did not equip McCarthy [*7] with a better car.

Ellis claims that Provident made an offer to McCarthy that it knew he would reject. At the time of Provident's offer, McCarthy earned an annual salary of $500,000 from Monarch. Ellis claims that Provident knew this and still offered McCarthy only $245,000 per year. According to Ellis, the health insurance and company car issues represented minor portions of the employment negotiations. Moreover, Ellis alleges that Provident interviewed McCarthy only to solicit information regarding a rival insurance company.

Following the unsuccessful employment discussions with McCarthy, Provident offered the Long Island branch manager position to Robert Stanilov, Provident's Downtown New York district manager. Stanilov was 35 years old when he accepted the offer.

### DISCUSSION

Ellis makes two basic claims for relief. Count I of the Complaint alleges that Provident discriminated against him on account of his age, in violation of the Age Discrimination in Employment Act, *29 U.S.C. §§ 621*-634 (1985). Count II of the Complaint alleges that Provident discriminated against him in violation of New York's age discrimination statute, New York State Human Rights Law, Executive [*8] Law § 296.

Defendants moved for summary judgment, contend-

Case 3:03-cv-00914-DJS    Document 56-15    Filed 03/26/2004    Page 3 of 18

Page 3
1995 U.S. Dist. LEXIS 10720, *8

ing there are no genuine issues of material facts to be tried. That motion is denied in part and granted in part. Plaintiff's cross-motion for partial summary judgment, asserting that Defendants discriminated against Plaintiff in violation of the ADEA and the state age discrimination statute, and that the trial should solely determine the extent of Plaintiff's damages, is denied.

## I. Summary Judgment Standards

The Court may grant summary judgment as a matter of law only if there is no genuine dispute as to any material facts. See, e.g., *Silver v. City University of New York*, 947 F.2d 1021, 1022 (2d Cir. 1991); *Montana v. First Fed. Sav & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir. 1989); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 94 L. Ed. 2d 762, 107 S. Ct. 1570 (1987). The Court's role on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight, 804 F.2d at 11*; see, e.g., *Twin Lab. Inc.* [*9] *v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990).

The movant bears the initial burden to inform the Court of the basis of its motion and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions to file, together with affidavits, if any," that show no genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). After the movant meets that burden, the party opposing the motion must demonstrate that a genuine dispute over material facts actually exists. Id.; see also *Greater Buffalo Press, Inc. v. Federal Reserve Bank*, 866 F.2d 38, 42 (2d Cir. 1989), cert. denied, 490 U.S. 1107, 104 L. Ed. 2d 1022, 109 S. Ct. 3159 (1989). The opposing party cannot solely rely on its pleadings, conclusory statements, or on the "mere hope" that discovery proceedings or a trial will disclose further evidence. See, e.g., *Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir. 1991), cert. denied, 502 U.S. 856, 112 S. Ct. 170, 116 L. Ed. 2d 133 (1991). Rather, the opposing party must present specific evidence supporting its contention that there is a genuine material issue of facts. [*10] *Celotex, 477 U.S. at 324*. To show a "genuine dispute," the opposing party must offer sufficient evidence to convince a reasonable jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); *Cinema North Corp. v. Plaza at Latham Assoc.*, 867 F.2d 135, 138 (2d Cir. 1989). The Court must deny summary judgment if "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact." *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9-10 (2d Cir. 1983) (citing *New York State Research & Dev. Auth. v. Nuclear Fuel Servs., Inc.*, 666 F.2d 787, 790 (2d Cir. 1981)).

## II. Provident's Motion for Summary Judgment

Defendants move for summary judgment on Counts I and II of Plaintiff's Complaint. Count I is based on the ADEA, and Count II is based on § 296 of the Executive Law of the New York State Human Rights Law. Inasmuch as the New York courts have consistently looked to federal case law in interpreting the Human Rights Law, this Court [*11] will interpret Count II of the Complaint under ADEA standards. See, e.g., *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992), cert. denied, 121 L. Ed. 2d 46, 113 S. Ct. 82 (1992); *Milwaukee Brewing Co. v. State Div. of Human Rights*, 66 N.Y.2d 937, 938-39, 489 N.E.2d 745, 747-47, 498 N.Y.S.2d 776, 777-78 (1985).

### A. Age Discrimination Standards

To make out a prima facie case of age discrimination under the ADEA, the Second Circuit has held that a plaintiff must show: "(1) [he] was a member of a protected class; (2) [he] was qualified for the job; (3) [he] suffered an adverse employment action 'under circumstances suggesting that age was a factor.'" *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 508 (2d Cir. 1994) (citing *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314, 316 (2d Cir. 1992)). The prima facie case "raises an inference of discrimination only because these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1985) (citation omitted). After the plaintiff [*12] establishes a prima facie case, the burden shifts to the defendant to articulate a "clear and reasonably specific," non-discriminatory business rationale for the employment action. *Id. at 258*; *Robinson, 21 F.3d at 508*; *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir. 1991). If the defendant meets that burden, the plaintiff still has the opportunity to show that the asserted non-discriminatory reason is a pretext for illegal age discrimination. The plaintiff need not show that age was the only factor motivating the employer's conduct. *Montana, 869 F.2d at 105*, but the plaintiff must prove by a preponderance of the evidence that age represented a "determinative factor." *Levin, 960 F.2d at 317*.

### B. Analysis

In the instant case, Ellis was both in the protected age group (over 40), and qualified for the job (as evidenced

by his 25 plus years employment). Provident does not challenge these facts. The only element of the prima facie case that is disputed is that age was a factor in the employment decisions. Provident denies that age played a role in the New York branch office split or in the commission change.

Ellis claims that the New York branch [*13] office split and compensation plan changes are direct results of Provident's age-based discriminatory animus. Ellis presented direct evidence to support his claim, showing "that the impermissible criterion played some part in the decision-making process." *Tyler v. Bethlehem Steel Corp., 958 F.2d at 1183* (citing *Barbano v. Madison County, 922 F.2d 139, 145 (2d Cir. 1990)*).

Ellis asserts that Provident knew that the new compensation system would detrimentally affect older branch managers. The Chief Officer of Provident's Accident Department stated that Provident management knew older managers would have a problem with the compensation system, but "it's to the company's advantage to have [older branch managers] retire." Plaintiff's Brief Exh. 27 at P 2. Provident's Regional Director noted in an internal memorandum that Provident maintained an "economic incentive to get rid of older managers." Plaintiff's Brief Exh. 28 at P 2. Moreover, Christiana, Provident's Chief Marketing Officer and Ellis's boss, referred to the older branch managers as "dinosaurs." Plaintiff's Brief Exh. 32 at P 44.

Ellis supported the direct evidence with statistical analysis. According to the Second [*14] Circuit, "a plaintiff may through statistical evidence establish a pattern and practice . . . from which an inference of age discrimination can be drawn." *Haskell v. Kaman Corp., 743 F.2d 113, 119 (2d Cir. 1984);* see *Stanojev v. Ebasco Services, Inc., 643 F.2d 914, 921 (2d Cir. 1981)* (statistical evidence may be used to establish a prima facie age discrimination case). Ellis alleges that the present value of his lost compensation totals $7,936,811.00. Moreover, Ellis's statistical evidence reveals a correlation between a branch manager's age and whether or not the manager's territory was altered. The study shows that the average age difference between branch managers whose territories were divided, reduced, or closed and those branch mangers put in charge of any newly created territories is 15.3 years. Ellis's report concluded that branch managers over 50 and earning over $200,000 were hurt most heavily by the territory divisions and compensation system changes. Thus, Ellis claims that Provident established a discriminatory policy to reduce older branch managers' territories, thereby decreasing their compensation, and forcing their retirement.

Provident counters Ellis's [*15] arguments and evidence with a non-discriminatory explanation for its actions. Provident claims that a legitimate business reason existed to create the Long Island branch office. The Long Island territory was the largest district office, and produced more business than any other district office. Because economic projections predicted substantial growth in Long Island, Provident wanted to better service that territory. Therefore, Provident decided to place a full-time branch manager in Long Island. Provident notes that ten of its thirteen New York region competitors already established Long Island to better service the area.

Provident argues that the decision to more effectively manage a growing territory and change its compensation system are legitimate business objectives, and do not represent intentional discriminatory acts. The company need not conduct an in-depth study before exercising a business decision. "A business decision need not be good or even wise. It simply has to be nondiscriminatory, for the only type of business decision that the ADEA prohibits is a business decision that discriminates against the aged." *Graefenhain v. Pabst Brewing Co., 827 F.2d 13, 20-21 (7th* [*16] *Cir. 1987);* see *Stanojev, 643 F.2d at 921-22* (a company has the "prerogative to be short-sighted and narrowminded . . .") (citing *Drown v. Portsmouth School Dist., 435 F.2d 1182, 1186 (1st Cir. 1970),* cert. denied, *402 U.S. 972, 29 L. Ed. 2d 137, 91 S. Ct. 1659 (1971)).*

Provident also disputes the statistical findings presented by Ellis, claiming that five errors in the report render it inaccurate. Specifically, Provident contends that the report: 1) incorrectly compared territory splits, closures, and "forced retirements"; 2) incorrectly compared affected branch managers and their replacements; 3) utilizes too small a sample size to raise an inference of discrimination; 4) incorrectly bases its conclusions on data collected from different time periods; and 5) incorrectly analyzes factors other than age.

Ellis need only allege facts sufficient to give rise to an inference of age discrimination to defeat Provident's motion. He is not required to prove that age discrimination was the only factor motivating the adverse employment action. The plaintiff must only prove that age discrimination was a motivating factor in the decision. See *Ostrowski v. Atlantic Mutual Ins.* [*17] *Cos., 968 F.2d 171, 182 (2d Cir. 1992); Zaken v. Boerer, 964 F.2d 1319, 1325 (2d Cir. 1992),* cert. denied, *121 L. Ed. 2d 375, 113 S. Ct. 467 (1992); Levin, 960 F.2d at 317.* Ellis presented direct evidence (age-based comments) and statistical evidence to support his claim that Provident improperly considered branch managers' ages when altering the compensation system and splitting territories. Provident disputes these facts, claiming that the split and compensation changes represented legitimate business decisions based upon appropriate factors. In addition, Provident claims Ellis's sta-

tistical report is inaccurate.

It is not the job of the Court to resolve disputed issues of fact—rather, the Court should assess whether factual issues remain to be tried. See *Knight, 804 F.2d at 11*. A jury could decide that the branch office splits, compensation system changes, and age-based comments amount to a violation of the ADEA and the New York Human Rights Law. Therefore, this Court finds that Counts I and II of Plaintiff's Complaint withstand Defendants' motion for summary judgment.

## II. Plaintiff's Cross-Motion for Partial Summary Judgment

Provident presented evidence [*18] that the New York branch office split resulted from a desire to better service a growing market, that it offered the job to another individual over the age of 40, and that Plaintiff's statistical report is inaccurate. This evidence, according to Provident, shows that it did not use age as a factor in its decisions. However, as noted previously, it is not the Court's role to determine issues of fact on a summary judgment motion. The Court need only identify if there are any issues of material fact.

This Court finds that Provident presented sufficient evidence to convince a jury that it did not illegally use age as a factor when it split Ellis's territory, and no violation occurred. Therefore genuine issues of material fact remain to be determined, and Plaintiff's cross-motion for summary judgment is likewise denied.

## III. Punitive Damages under New York State Human Rights Law

Ellis demands punitive damages in Counts I and II of the Complaint. This Court agrees with Defendants that punitive damages are not available under the ADEA. See *Johnson v. Al Tech Specialties Steel Corp., 731 F.2d 143, 147 (2d Cir. 1984)* (punitive damages are unavailable under the ADEA). The Court [*19] further agrees that punitive damages are not available under the Human Rights Laws. The New York Court of Appeals has held that punitive damages are not available in employment discrimination cases under the Human Rights Laws. *Thoreson v. Penthouse Int'l. Ltd., 80 N.Y.2d 490, 499, 606 N.E.2d 1369, 591 N.Y.S.2d 978,* (1992), reargument denied, *81 N.Y.2d 835, 595 N.Y.S.2d 397, 611 N.E.2d 298 (1993)*. The New York Court of Appeals relied on the Second Circuit decisions that held that punitive damages are not available under New York State Human Rights Laws. See *Tyler v. Bethlehem Steel Corp., 958 F.2d at 1191; Wood v. Brosse U.S.A., Inc., 788 F. Supp. 772 (S.D.N.Y. 1992)*. Therefore, Plaintiff's demands for punitive damages under Counts I and II are dismissed.

## CONCLUSION

For the reasons expressed above, Defendants' motion for summary judgment is denied in part and granted in part. Plaintiff's demands for punitive damages under the ADEA and the New York State Human Rights Law are dismissed. Plaintiff's cross-motion for summary judgment is also denied. This action is given a ready-for-trial date of October 2, 1995. Pre-trial materials are due no later than September [*20] 18, 1995. The Court's ready-for-trial materials are enclosed.

SO ORDERED

Dated: New York, New York
July 31, 1995

**JOHN F. KEENAN**

**United States District Judge**

LEXSEE 1999 U.S. APP. LEXIS 34238

KEVIN WALSH, Plaintiff-Appellant,-v.-UNITED CABLE TECH SVCS CORP & TELECOMMUNICATIONS INC., Defendant-Appellee.

99-7764

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

1999 U.S. App. LEXIS 34238

December 20, 1999, Decided

**NOTICE:** [*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1999 U.S. App. LEXIS 37042.*

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Connecticut (Eginton, J.).

**DISPOSITION:** AFFIRMED.

**LexisNexis (TM) HEADNOTES- Core Concepts:**

**COUNSEL:** APPEARING FOR APPELLANT: IGOR I. SIKORSKY, JR., Wethersfield, CT (John N. Tieman, Law Office of Igor I. Sikorsky, Jr., P.C., on the brief).

APPEARING FOR APPELLEE: MARGARET J. STRANGE, Hartford, CT (James F. Shea, Jackson, Lewis, Schnitzler & Krupman, on the brief).

**JUDGES:** PRESENT: HON. WILFRED FEINBERG, HON. DENNIS JACOBS, HON. ROBERT A. KATZMANN, Circuit Judges.

**OPINION:**

SUMMARY ORDER

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment be AFFIRMED.

Kevin Walsh appeals from the judgment of the United States District Court for the District of Connecticut granting summary judgment in favor of United Cable Technologies Services Corporation and Telecommunications, Inc. ("TCI") in Walsh's age discrimination action. See *Walsh v. United Cable Techs. Servs. Corps. & Telecomms., Inc., 46 F. Supp. 2d 170 (D. Conn. 1999).* In 1995, TCI hired Carlene [*2] McFadyen, age 33, as General Manager instead of Walsh, age 54. On appeal, Walsh argues that the district court erred by failing to recognize that the reasons offered by TCI for its employment action were mere pretext for age discrimination.

We review the district court's grant of summary judgment de novo. See *Young v. County of Fulton, 160 F.3d 899, 902 (2d Cir. 1998).* Claims under the Age Discrimination in Employment Act, *29 U.S.C. § 621* et seq. ("ADEA"), follow the same three-step burden-shifting framework as Title VII claims, as set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* See *Viola v. Philips Med. Sys., 42 F.3d 712, 715-16 (2d Cir. 1994).* A plaintiff must first establish a prima facie age discrimination case by demonstrating (1) that he belongs to the protected age group, (2) that he was qualified for the position in question, (3) that he suffered an adverse employment action, and (4) that the action occurred in circumstances giving rise to an inference of discrimination. See *Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994).* [*3] If a prima facie case is established, the defendant must proffer a legitimate, non-discriminatory business reason for the employment action. See id. If the defendant articulates an age-neutral reason, then the plaintiff bears the burden of proving that the proffered reason is mere pretext and that age was the real reason for the employment action. See *Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir. 1998).*

TCI disputes whether Walsh made out a prima facie case, but for purposes of this appeal we will assume that Walsh met this initial de minimis burden and that the burden shifted to TCI. As the district court correctly stated, TCI "has articulated two legitimate nondiscriminatory business reasons for its employment action: (1) Walsh's termination was a result of a division wide reorganization; and (2) McFadyen was selected because she

was better qualified for the position, with a communications degree and a record of strong performance." *Walsh, 46 F. Supp. 2d at 173.*

(1) Walsh failed to establish that TCI's reorganization was a sham. His claim that the circumstances of his interview demonstrate age discrimination amounts to nothing more than [*4] "unsupported assertions" and "conjecture or surmise." *Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).* The circumstance that his interview "lacked substance and professionalism" raises no issue of fact that is material to alleged discrimination based on age. See *Norton, 145 F.3d at 120* ("The ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age.").

(2) As to TCI's proffered reason that McFadyen was the better candidate, Walsh must do more than show that TCI made a poor choice. He must demonstrate that TCI's selection of McFadyen was "so lacking in merit as to call into question its genuineness." See *Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988).* Although Walsh introduced evidence indicating he had more experience than McFadyen and marginally superior performance evaluations, McFadyen had a degree in communications, and a strong employment record that (unlike Walsh's) was untainted by written warnings or reprimands. It is clear from our review of the record that Walsh did not [*5] meet his burden of proving that TCI's business decision to hire McFadyen was "so lacking in merit as to call into question its genuineness." Id.

For the reasons set forth above, the judgment is hereby **AFFIRMED.**

LEXSEE 2004 US DIST LEXIS 1561

**PATRICIA GREY, Plaintiff, v. CITY OF NORWALK BOARD OF EDUCATION, VICTOR HERBERT, AND GREG RICCIO, Defendants.**

3:00-cv-2033 (JCH)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2004 U.S. Dist. LEXIS 1561*

**February 4, 2004, Decided**

**DISPOSITION:** Defendants' motion for summary judgment granted in part and denied in part.

**LexisNexis (TM) HEADNOTES- Core Concepts:**

**COUNSEL:** For Patricia Grey, MD, PLAINTIFF: Anita B Folino, Plunkett & Cooney, East Lansing, MI USA. Gary Edward Phelan, Klebanoff & Phelan PC, West Hartford, CT USA. Tammy Marzigliano, Klebanoff & Phelan, PC, West Hartford, CT USA.

For Victor Herbert, Greg Riccio,Norwalk BD of Ed, DEFENDANTS: Michael Peter McKeon, Sullivan, Schoen, Campane & Connon, Hartford, CT USA.

**JUDGES:** [*1] Janet C. Hall, United States District Judge.

**OPINIONBY:** Janet C. Hall

**OPINION: RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 38]**

Plaintiff Patricia Grey asserts claims of unlawful discrimination based on Title VII (*42 U.S.C. § 2000e et seq.*) the Connecticut Fair Employment Practices Act, *Conn. Gen. Stat. § 46a-60(a)(1)* ("CFEPA"), and *42 U.S.C. § 1983*, and common law negligent infliction of emotional distress. Defendants City of Norwalk Board of Education ("Board"), Superintendent Victor Herbert, and now-former Deputy Superintendent Greg Riccio (hereinafter referred to as "defendants") move for summary judgment. For the following reasons, the motion is granted in part and denied in part.

**I. BACKGROUND**

Plaintiff Patricia Grey, PhD, an African-American female, served as the Norwalk Public Schools' Director of Curriculum and Assessment from July 1994 until September 1999. She contends that she suffered in a hostile work environment and was ultimately constructively discharged from her position with the District because of a series of incidents between July 1998 and her [*2] resignation in September 1999. Grey describes the series of incidents detailed below. n1

> n1 On this motion for summary judgment, the court views the evidence in the light most favorable to the plaintiff.

Herbert became the District Superintendent in July 1998. Soon after, the position of Deputy Superintendent became available. Grey approached Herbert about the job, but Herbert told her "she should not apply for the position." Aff. of Patricia Grey, Pl.'s Rule 56(a)(2) Statement, Ex. B, ("Grey Affidavit") at P5 [Dkt. No. 39]. Herbert placed her on probation for not meeting her job responsibilities. Id. at P22. Caucasians with fewer responsibilities, which were not being met, were not put in any type of a probationary process. Id.

Herbert hired Riccio during the fall of 1998. Shortly after Riccio took over the Deputy Superintendent position, he approached Dr. Grey and told her that she should "look out for yourself" and start trying to find a Superintendent position at another school district or with [*3] a private corporation. Id. at P13. In January 1999, Riccio told Grey that her position was being eliminated at the end of the 1998-99 school year. Id. at P28.

On or about January 25, 1999, Grey learned that Herbert had asked his secretary to type a letter notifying Grey that she was being terminated. When Grey confronted Herbert, he denied the charge. Id. at P30.
Grey claims that the administration also gave her the responsibilities of three supervisors who were eliminated or had assignments removed from them, but did not give her extra secretarial support even though two of those supervisors had worked with full-time secretaries. Id. at 1; Grey Aff. at P2.

In a meeting on January 26, 1999, Herbert eliminated all of Grey's responsibilities except oversight for elementary education. Id. at P20. Herbert said that "perhaps [Grey] could do that one thing well." Aff. at P21. He said in a January 27, 1999 memo that he did this in response to her concerns that she had too much to do. 1/27/99 Memo from Herbert to Grey, Pl.'s Rule 56(a)(2) Statement, Ex. D [Dkt. No. 39]. Grey responded on January 29, asserting that she "never complained about and never asked to be [*4] relieved of any of my 16 responsibilities or other initiatives, projects, and partnership. Although I have said that I have a lot to do and need sufficient staff support to accomplish everything to the degree the district expects." 1/29/99 Memo. from Grey to Herbert, Pl.'s Rule 56(a)(2) Statement, Ex. A at 2 [Dkt. No. 39].

In March, Riccio interrupted a meeting of district principals chaired by Grey and demanded to discuss an item not on the agenda. Grey saw this as a usurpation of her authority in front of her subordinates. Id. at P31. These actions never occurred with white male administrators in the district. Id. at P31.

During the time from January to June 1999, Herbert also sent Grey petty reprimands that were not sent to white male employees. Id. at P34. Grey received a positive evaluation in June 1999, with a few noted areas for improvement. Riccio, "Cabinet Self-Evaluation," Defs' Local Rule 9(c)(1) Statement [Dkt. No. 36], Ex. E.

Many people, including Board of Education President Rosa Murray, advised Grey to contact an attorney, suspecting that she was the victim of racial discrimination. When a special Board meeting was scheduled in June 1999, about 50 [*5] community members fearing termination of Grey appeared at the meeting to support her. Herbert cancelled the meeting. Grey Aff. at P35.

Grey further alleges that she was the only one of her colleagues not allowed to "crosstrain secretaries" for different responsibilities and that she was not compensated for extra technology-related responsibilities, though a white, male colleague was. Id. at P11.

Herbert informed Grey on July 15, 1999, that he wanted to buy out her contract. Id. at P42. Herbert said to consider herself "finished" and not to come to work. Grey insisted on remaining at work until a separation agreement was reached. Id. at P42, 46.

Herbert suggested on July 28, 1999, that she prepare a letter of resignation and outline proposed separation terms for the Board. Id. at P44. Grey refused to prepare the letter, id., but did compose a memo setting forth proposed separation terms. Defs.' Local Rule 9(c)(1) Statement, Ex. K [Dkt. No. 36].

The Board refused to accept a separation proposal at its August 31, 1999 meeting, in which the Board met with Herbert while Grey remained outside. Grey Aff. at P45. Afterwards, Board President Murray told Grey that the [*6] Superintendent had told the Board that Grey had approached him and proposed the buyback, and had also not shared his memos of July 15 and July 28 with the Board. Id. at P45.

In September, Grey contends that the aggregation of these events pushed her to the point of being physically and emotionally unable to return to work at Norwalk. She provided the Board with notice on September 16, 1999. Id. at P46.

Grey filed an EEOC claim on March 8, 2000, alleging discrimination based on race, color, sex, and age. Pl.'s Mem. and Rule 56(a)(2) Statement, Ex. M [Dkt. No. 39]. She also filed claims with the CHRO. Id. at 15; Defs.' Local Rule 9(c)(1) Statement, Ex. N [Dkt. No. 36].

Grey filed this action on October 20, 2000, alleging race, national origin, sex, and age discrimination in violation of Title VII; race, national origin, sex, and age discrimination in violation of the Connecticut Fair Employment Practices Act; violation of her *fourteenth amendment* right to equal protection of the laws, brought under *42 U.S.C. § 1983*; and negligent infliction of emotional distress.

## II. DISCUSSION

**A. Standard** The role of the court on summary judgment [*7] is "not to try issues of fact, but only to determine whether there are issues of fact to be tried." *Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995)*. In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002)*. Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson, 477 U.S. at 256*, and present such evidence that would allow a jury to find in his favor. *Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)*. In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Anderson, 477 U.S. at 255*. "Summary judgment [*8] is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 253 (2d Cir. 2002)*.

The plaintiffs, however, cannot escape summary judgment merely by asserting that unspecified disputed material facts exist or through conjecture or speculation. *Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).* If little or no evidence supports the non-moving party's case, there is no genuine issue of material fact and summary judgment may be appropriate. *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994).* Disputed facts that are not material to the issues in the case may not defeat summary judgment. *Hemphill v. Schott, 141 F.3d 412, 416 (2d Cir.1998).* See also *Anderson, 477 U.S. at 247-48* (the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact").

**B. Title VII Claims** Grey [*9] claims that the defendants discriminated against her based on her race, sex, age, and national origin, in violation of Title VII. The defendants argue that (1) age discrimination is not cognizable under Title VII; (2) that the actions complained of do not support an inference of constructive discharge; (3) that the harassment alleged by Grey is insufficient to support a hostile work environment claim; and (4) that Grey did not exhaust her national origin claim.

Under Title VII, a claim for employment discrimination is governed by the burden shifting analysis of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* This analysis requires the plaintiff to first establish a prima facie case of discrimination. To do so, the plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she experienced an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)* (citing *McDonnell Douglas, 411 U.S. at 802*). This prima facie case creates a presumption [*10] that the employer unlawfully discriminated against the plaintiff, and the burden then shifts to the employer to "articulate a legitimate, clear, specific and nondiscriminatory reason" for its actions. *Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995);* see also Texas Dep't of *Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).* If the employer does so, the plaintiff then has the burden to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination. *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).*

**1. Proper Title VII Parties (Individual Defendants)**

As an initial matter, the court notes that a Title VII claim cannot be brought against individual supervisory employees, but only against the employer itself. See, e.g., *Looby v. City of Hartford, 152 F. Supp. 2d 181, 184 (D. Conn. 2001)* (citing *Tomka v. Seiler Corp., 66 F.3d 1295, 1314-17 (2d Cir. 1995),* abrogated on other grounds, *Burlington Indus. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)).* [*11] As a result, summary judgment is granted on the Title VII claims against Herbert and Riccio.

**2. Age Discrimination/Title VII (Board)**

Next, the court agrees with the defendants that age discrimination is not within the scope of Title VII. That statute makes it "an unlawful employment practice" for an employer to "discharge or otherwise discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1).* See also Barbara Lindemann and Paul Grossman, Employment Discrimination Law 5 (3rd ed. 1996). The Age Discrimination in Employment Act, *29 U.S.C. § 621-34* ("ADEA"), prohibits age discrimination, but Grey does not reference the ADEA in her complaint or papers. Thus, summary judgment is granted on Grey's Title VII age discrimination claim.

**3. National Origin Discrimination/Title VII (Board) a. Exhaustion**

The Board argues that Grey's claim of discrimination on the basis of national origin is barred because she failed to raise it before the EEOC. A plaintiff must raise claims of discrimination at the applicable administrative agency before pursuing [*12] those claims in federal court. A claim is exhausted if it was actually raised or is "reasonably related" to a claim raised. *Butts v. City of New York Dep't of Housing Preserv. and Dev., 990 F.2d 1397, 1402 (2d Cir. 1992),* superseded on other grounds by statute as stated in *Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998).*

The Second Circuit has recognized three situations in which a claim is "reasonably related." First, a non-exhausted claim is "reasonably related" when its omission is essentially due to "loose pleading," and when the claim is within the scope of the investigation which would reasonably be expected to grow out of the agency claim. *Butts, 990 F.2d at 1402.* The second type of allowed, related claim is one alleging retaliation for filing a claim before the agency itself. Id. The third is where the unexhausted claim is a post-agency incident of discrimination carried out in precisely the same manner as the action complained of to the agency. Id.

Because Grey's unexhausted national origin claim arises out of the same incidents as those alleged, suggesting a different basis for those same events, only the

Case 3:03-cv-00914-DJS   Document 56-15   Filed 03/26/2004   Page 11 of 18

Page 4
2004 U.S. Dist. LEXIS 1561, *12

first [*13] type of related" claim could be at issue here. Grey raised discrimination on the basis of sex, race, age, and color with the EEOC. Pl.'s Mem. and Rule 56(a)(2) Statement, Ex. M [Dkt No. 39]. In her complaint in this action, Grey states that she is "of African descent" and that the defendants also discriminated against her on that ground.

While "race" and "color" are somewhat related to "national origin," they are distinct bases for discrimination. While the investigation into her claim would have encompassed the way she was treated versus non-black employees, male employees, or younger employees, a national origin claim would in theory entail an investigation into how other employees of non-African descent were treated.

The content of Grey's Title VII allegations in the complaint, however, seems to treat discrimination against her because of her national origin as identical to discrimination against her because of her race. See Compl. at P38 ("The City of Norwalk Board of Education treated the Plaintiff differently than other similarly situated white male administrators and younger administrators"). Factwise, this would make the claims related. See *Forbes v. State Univ. Of New York at Stony Brook*, 259 F. Supp. 2d 227, 233-34 (E.D.N.Y. 2003) [*14] (plaintiff's ethnicity claim was reasonably related to her EEOC allegations of race, color, and sex discrimination because they were "essentially the same claim"). For purposes of this motion, the court concludes there was exhaustion of the national origin claim.

### b. Prima Facie Case

However, Grey does not present any evidence to support a prima facie case of national origin discrimination. All Grey alleges is that she is of "African descent"; she then presents evidence that she was discriminated against because of her race. See, e.g., Grey Aff. at P10, 11, 22, 31, 34 ("caucasian male," "white male"). Even if the court assumes that her statement that she is "African-American," id. at P22, establishes her membership in a protected "national origin" class, and even if it does set forth a prima facie case of race discrimination, it does not set forth circumstances giving rise to an inference of discrimination on the basis of "national origin." Without any evidence to support that basis, summary judgment on the plaintiff's Title VII national origin claim is granted.

### 4. Constructive Discharge/Title VII (Board)

The defendants also argue that the actions of which Grey [*15] complains did not rise to the level of intolerability necessary to establish constructive discharge. The court disagrees and denies summary judgment on this claim.

To present a prima facie case of discriminatory discharge action under Title VII, Grey must show that she was either actually or constructively discharged, and that "the discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class." *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003). n2

> n2 Proof of such a causal connection can be established through "evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Terry*, 336 F.3d at 152.

### a. Constructive Discharge Showing

Constructive discharge occurs when an employer "intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Id.* at 151-152 (citing *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 161 (2d Cir.1998), [*16] *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)). "The effect of adverse conditions is cumulative." *Id.* at 90.

Grey presents a variety of circumstances that, combined, she argues made her situation "intolerable," including: the repeated threat that her position would be eliminated; a rumored letter announcing her termination; Riccio's public usurpation of her authority in front of her subordinates; the administration's manipulation of her curricular responsibilities; petty reprimands; and Herbert's suggestion that the District buyback her contract and his subsequent comment that she should consider herself "finished." Together, these circumstances support a reasonable inference of constructive discharge. On Grey's version of the facts, the fact-finder could determine that it was reasonable for her to assume that she was "compelled to leave." Id.

Moreover, threats of termination alone are sometimes sufficient to show constructive discharge. See *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987). Here, Riccio told Grey to "watch out for herself," and warned her that her job would be eliminated at [*17] the end of the year. This also supports an inference of constructive discharge, especially when combined with the other actions that Grey alleges. See *Chertkova*, 92 F.3d at 90 (supervisor's comment to plaintiff that she would not "be around" supported finding of constructive discharge); *Terry*, 336 F.3d at 153 (supervisor's comments to plaintiff that "your days are numbered" and that his "life's over with" and "you're going to be brought up on more charges" would allow a reasonable person to infer that he was not wanted as an employee and that he was going to be forced out). n3

Case 3:03-cv-00914-DJS   Document 56-15   Filed 03/26/2004   Page 12 of 18

Page 5
2004 U.S. Dist. LEXIS 1561, *17

n3 The defendants argue that Grey's contentions are belied by language in letters from Herbert to Grey and by the fact that he signed her contract for the 1999-2000 school year. Those differences create an issue of material fact, however, and go to the weight of the evidence, not its sufficiency. See *Kirsch, 148 F.3d at 162*.

Grey's version of the facts, if believed, would also establish [*18] that the Board deliberately sought to compel her to leave her position. See *Stetson v. Nynex Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993)*. For instance, Grey alleges that Herbert approached her about a contract buyback, then lied to the Board when he presented her proposal, representing instead that she had initiated the buyback. This occurred after she had been told several times that her position would be eliminated and warned to watch out for herself.

b. **Inference of Discrimination**

1. Race.

Grey presents a variety of facts to support her racial discrimination claim. She alleges, and attests in her affidavit, that Riccio usurped her authority at a meeting with her subordinates, and that she discussed the issue of racial discrimination with him then. She further contends that the Board of Education treated her differently than other similarly situated white male administrators. She alleges that during the period January through June 1999, she received support from Board of Education members and employees, who expressed their belief that Dr. Grey was the victim of discrimination and advised her to contact and attorney, including Board of Education President [*19] Rosa Murray. Grey further draws the court's attention to a September 2000 CHRO decision finding the City of Norwalk Board of Education liable for race, color, and age discrimination in its decision to deny a Norwalk teacher, John Saunders, promotion to assistant principal in 1997. Pl.'s Rule 56(a)(2) Statement, Ex. K [Dkt. No. 39]. Grey also claims that she was not given extra compensation for her technology-related duties, though a white, male colleague was. Grey Aff. at P11. Finally, Grey's affidavit recounts numerous conversations with Norwalk officials, acknowledging the discrimination that she was suffering, including one Board Member, Rick Fuller, who commented that "he predicted that all minorities would be eliminated from the Central Office by Victor Herbert." Id. at P39.

"Direct evidence of discrimination is not necessary." *Lizardo v. Denny Inc.'s, 270 F.3d 94, 104 (2d Cir. 2001)* (citing *Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir.1998))*. "If there is sufficient circumstantial evidence on which to build a case, it is for the jury to determine what inferences can be drawn from that evidence." *Id.* Indeed, circumstantial [*20] evidence is common in discrimination suits, because "an employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." *Norton, 145 F.3d at 119* (quoting *Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir.1991))*. Grey has thus presented evidence that satisfies her prima facie burden. The Board does not appear to offer an alternative, legitimate reason to explain the events she describes; as a result, especially given the fact-intensive inquiry that questions of employer intent involve, Grey has presented ample evidence to proceed to trial on her Title VII race discrimination constructive discharge claim.

2. Sex. Grey's sex discrimination claim presents more difficulty. As with race discrimination, the initial burden in a sex discrimination claim is on the plaintiff to establish a prima facie case of discrimination. *Weinstock, 224 F.3d at 42*.

Grey has not come forward with evidence to support a prima facie case of sex discrimination. She repeatedly alleges that "white males" were treated differently and points out that a white male colleague [*21] was compensated for his technology responsibilities while she was not. She gives no additional evidence to support her case and provides no comments based on sex. "[A] plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive." See *Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001)*. The evidence that Grey presents regarding one male colleague, who is white, without further information regarding those circumstances or any other evidence regarding sex discrimination, is insufficient for a jury to draw the inference of sex discrimination. Thus she has not met even the "de minimus" burden required of her at this stage. See *Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203-04 (2d Cir. 1995)*.

c. **Board's Liability**

As the discussion above suggests, there is also a sufficient basis for holding the Board liable under Title VII for the discrimination, though the defendants have not raised this issue. Under Title VII, an "employer" is defined as "a person engaged in an industry affecting commerce . . ., and any agent of such person." *42 U.S.C. § 2000e(b)* [*22] (emphasis added); see also *Levendos v. Stern Entm't, Inc., 909 F.2d 747, 751 (3rd Cir. 1990)* (the action of supervisors is imputed to the employing entity through agency principles). "The term 'agent' is not defined by Title VII, but has been interpreted by courts as an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." *Pierce v. Commonwealth Life Ins. Co., 40*

Case 3:03-cv-00914-DJS   Document 56-15   Filed 03/26/2004   Page 13 of 18

Page 6
2004 U.S. Dist. LEXIS 1561, *22

F.3d 796, 803 (6th Cir. 1994)* (internal citations omitted). Here, Grey alleges discriminatory conduct by the District's top officials, the Superintendent and Deputy Superintendent. She further alleges that Board members, including the Board President, told her that they thought she was a victim of discrimination and that she should get a lawyer, and that they were aware that Herbert had lied to them about the circumstances of the buyback. By Grey's facts, then, the Board was explicitly aware of the discrimination and allowed it to continue, then ratified her constructive discharge. See also infra at 27-28 (discussing Board's liability under *§ 1983*).

For all these reasons, summary judgment [*23] on Grey's Title VII constructive discharge claim against the Board is denied with regard to race discrimination; granted with regard to sex, age, and national origin discrimination.

### 4. Title VII Hostile Work Environment Claim (Board)

The Board also seeks summary judgment on Grey's hostile work environment claim. "A hostile work environment claim requires a showing [1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello, 294 F.3d 365, 373 (2d. Cir. 2002)*.

#### a. Hostile Work Environment Showing

Demonstrating that conduct was sufficiently severe to alter the terms of the plaintiff's employment has "objective and subjective elements: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Terry, 336 F.3d at 128* (internal quotations omitted). The court must consider "the frequency of the discriminatory [*24] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993))*.

As with constructive discharge, the court examines the totality of the circumstances. *Id.* (quoting *Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999)*). While this is a case-by-case analysis, "a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Alfano, 294 F.3d at 373* (quoting *Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000))*(internal quotation marks omitted). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is [*25] violated." *Harris, 510 U.S. at 21*(internal quotations omitted).

The Second Circuit recently clarified the showing necessary for establishing a hostile work environment claim in *Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003)*. The Circuit cautioned, "While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*." *Id. at 148* (quoting *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000))*(internal quotation marks omitted)(emphasis in original).

Grey alleges that her supervisors harassed her in several ways that altered her job for the worse. She claims, among other things, that Herbert and Riccio manipulated her responsibilities, undermined her in front of her subordinates, sent her petty reprimands, and did not allow her the customary secretarial support for her duties, trying [*26] to set her up to fail. While this type of harassment may be different than, for instance, that alleged in *Richardson, 180 F.3d at 438-40*, where the plaintiff claimed, among other things, that co-workers had put hair in her food and shot rubberbands at her, it nonetheless created circumstances in which the conditions of Grey's employment were altered for the worse. See *Terry, 336 F.3d at 148*.

Grey's claims also differ from many hostile work environment claims because she does not allege any explicitly racial or sexist remarks as part of her evidence. Instead, she Grey merely alleges that she was treated differently from white, male supervisors. Though hostile environment claims often involve racial or sexual remarks, see, e.g., *Richardson, 180 F.3d at 434*, the alleged harassment need not be explicitly sexual or racial, though a basis must exist for inferring that the conduct occurred because of the defendant's membership in the protected class. See *Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 n.6 (3d Cir. 1990)*; *Ricks v. Conde Nast Publ'n, Inc., 92 F. Supp. 2d 338, 349 (S.D.N.Y. 2000)*, [*27] aff'd, *6 Fed. Appx. 74 (2d Cir. 2001)*. The Supreme Court has explicitly held that these inferences can be established by direct comparative evidence. *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 140 L. Ed. 2d 201, 118 S. Ct.*

Case 3:03-cv-00914-DJS   Document 56-15   Filed 03/26/2004   Page 14 of 18

Page 7
2004 U.S. Dist. LEXIS 1561, *27

*998 (1998)* ("A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace, [but] . . . must always prove that the conduct at issue . . . actually constituted "discrimination . . . because of . . . sex."); see also *Ricks, 92 F. Supp. 2d at 349* (it is an "open question" whether plaintiff's sole proof of intent that she was treated differently from the non-African-American account managers was sufficient to support hostile work environment claim).

**b. Inference of Discrimination**

1. Sex. As discussed above, Grey's bare allegation that she was treated differently from males and her identification of one white male whom she alleges was compensated for technology responsibilities while she was not is insufficient support for her case to go to the jury on sex discrimination. See supra, 15-16. She [*28] provides no additional evidence to support her case, provides no comments based on sex, and does not even identify the other similarly situated "males" who were treated differently. As a result, she has not created an issue of fact on this claim.

2. Race. Also as discussed above, Grey does present sufficient support for her case that the workplace hardships she endured were because of her race. See supra, 14-15. The court recognizes that questions of employer intent, like those in this case, involve "an assessment of individuals' motivations and state of mind," *Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)*, an assessment better left to the trier of fact than to the court on summary judgment. Moreover, Grey presents evidence that others commented on the discrimination, and attributed mistreatment of her to her race. See, e.g., Grey Aff. at PP38-41.

As a result, the defendants' motion for summary judgment on Grey's Title VII hostile work environment claim against the Board is denied as to race discrimination, and granted as to sex, age, and national origin discrimination. n4

---

n4 The actions of Riccio and Herbert are also attributable to the Board, though the defendants have not raised this issue with regards to Grey's Title VII hostile work environment claim. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc., v. Ellerth, 524 U.S. 742, 745, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998); Mack v. Otis Elevator Co., 326 F.3d 116, 127-28 (2d Cir. 2003)*. Where there is no tangible employment action, the employer may impose certain affirmative defenses, including that the employer exercised reasonable care to prevent and promptly correct the behavior. See *id. at 127*. Here, Grey alleges among other things that the Board President advised her that she was being discriminated against and should get a lawyer, yet the Board took no action to remedy the situation.

[*29]

**C. Connecticut Fair Employment Practices Act**

**1. Individual Claims**

As with Title VII, Grey cannot assert claims against individual supervisors under CFEPA. See *Perodeau v. City of Hartford, 259 Conn. 729, 792 A.2d 752 (2002)*. As a result, Grey's individual CFEPA claims against Herbert and Riccio are dismissed.

**2. Claims Against the Board**

The defendants argue that summary judgment should also be granted on Grey's CFEPA claims against the Board. They content that, as with Grey's Title VII claims, she has failed to show constructive discharge, and has also "failed to establish that she suffered from discriminatory harassment sufficient to alter the conditions of her workplace." Defs.' Mem. In Supp. Of Summ. J. at 2.

The court looks to federal employment anti-discrimination law for guidance in enforcing Connecticut's anti-discrimination statute. See *Brittell v. Dept. of Corr., 247 Conn. 148, 717 A.2d 1254 (1998)*(relying on Second Circuit's opinion in Chertkova); *Levy v. Comm'n on Human Rights and Opportunities,35 Conn.App. 474, 646 A.2d 893 (1994)*. As discussed above, Grey has presented sufficient evidence [*30] from which a reasonable trier of fact could infer that she was constructively discharged. See supra 12-13. Summary judgment on Grey's constructive discharge race discrimination claim against the Board is thus denied.

Grey has also, for the reasons discussed above in relation to her Title VII claims, produce sufficient evidence to proceed to trial on her race discrimination hostile work environment claim. Thus the defendants' motion for summary judgment on that CFEPA hostile work environment race discrimination claim is also denied.

Grey has not presented sufficient evidence to create a prima facie case on her sex discrimination claim. As discussed above in relation to Title VII, Grey must come forward with sufficient evidence to support a jury's reason-

able inference that she was discriminated against because of her sex. She has not done so. See supra at 15-16. The court thus grants summary judgment on Grey's CFEPA sex discrimination claim.

Unlike under Title VII, age discrimination is actionable under CFEPA. See *Conn. Gen. Stat. § 46a-59*. However, the plaintiff has presented absolutely no evidence on that claim: no evidence from which a jury [*31] could infer that any action of the defendants was based even in part on age, and only one repeated bare allegation that younger employees were treated differently. Compl. at P38. As a result, summary judgment on Grey's CFEPA age discrimination claims is granted.

Finally, for the reasons discussed above in relation to Title VII, Grey has not made the required prima facie showing as to national origin discrimination. See supra at 10-11. (discussing national origin showing required by Title VII to state a prima facie case). Summary judgment is granted on that claim.

**D. *Section 1983* Claims**

The defendants also move for summary judgment on Grey's *§ 1983* claims in Count 3 of the Complaint, arguing that she has failed to allege that the defendants intentionally sought to discriminate against the class of plaintiffs of which she is a part. The defendants further argue that, in any case, Grey has not demonstrated that the Board was involved in the discrimination such as to be held liable under *§ 1983*, and that Herbert and Riccio are entitled to qualified immunity.

**1. Pleading Requirements**

The defendants claim that Grey has not properly pled her *§ 1983* equal protection [*32] violation claim, and that as a result it must fail. This argument is without merit.

A plaintiff may plead concurrent violations of Title VII and *§ 1983* (or, indeed, only *§ 1983* claims) against a municipal government body as long as the constitutional claims allege the violation of a constitutional right. See *Annis v. County of Westchester, 36 F.3d 251, 255 (2d Cir. 1998)*; *Gierlinger v. New York State Police, 15 F.3d 32, 34 (2d Cir. 1994)*. There is a long-recognized constitutional right to be free from sex discrimination in public employment. See *Annis, 36 F.3d at 254* (citing *Davis v. Passman, 442 U.S. 228, 60 L. Ed. 2d 846, 99 S. Ct. 2264 (1979)*). Similarly, Grey also has a constitutional right to be free from discrimination based on her race or national origin. See, e.g., *Hazelwood School Dist. v. United States, 433 U.S. 299, 316 n. 3, 53 L. Ed. 2d 768, 97 S. Ct. 2736 (1977)*.

The defendants argue that Grey has failed to allege an "intent to disadvantage all members of a class that includes plaintiff," as required to state an equal protection claim. *Weixel v. Board of Educ. of City of New York, 287 F.3d 138, 151 (2d Cir. 2002)*. [*33] However, the plaintiff in Weixel did not allege that the school had discriminated against her because of an intent to disadvantage a class of which she was a member, or allege anything else that would state an equal protection claim. Instead, the complaint, as described by the district court, alleged only that the "defendant . . . failed to afford [the plaintiff child] 'equal treatment under the law as other children were evaluated academically before deciding on class placement.'" *Weixel v. Board of Educ. of City of New York, 2000 U. S. Dist. LEXIS 11041, 2000 WL 1100395 at * 7 (S.D.N.Y. August 7, 2000)*. The district court concluded that the equal protection claim had to be dismissed because, among other things, the plaintiff did not "allege that the school discriminated against a particular class of students when it failed to test [plaintiff] or place [plaintiff] in her eighth grade class." *Id*. The Second Circuit affirmed this portion of the opinion. *Weixel, 287 F.3d at 151*.

Here, however, Grey does allege an intent to disadvantage the groups of which she is a member. She alleges at the beginning of her complaint that she was "discharged after several months [*34] of race, sex, age and national origin discrimination," Compl. at P1, and in her support of her equal protection claim, alleges that the "three Defendants discriminated against Plaintiff on the basis of her race, national origin, and sex by harassing her and ultimately causing her constructive discharge from the school district in September 1999." Compl. at P49. This and the rest of Grey's *§ 1983* pleading is sufficient.

**2. *§ 1983* Race Discrimination Claim**

Grey claims that the defendants discriminated against her because of her race, in violation of the *fourteenth amendment to the Constitution*. "A state and its instrumentalities may not deny 'any person within its jurisdiction the equal protection of the laws.'" *Sound Aircraft Servs., Inc. v. Town of East Hampton, 192 F.3d 329, 335 (2d Cir. 1999)*(quoting *U.S. Const. Amend. XIV*). "At its core, equal protection prohibits the government from treating similarly situated persons differently." *Id*.

Employment discrimination claims brought under *§ 1983* are analyzed according to the same standards as used to evaluate Title VII claims. See *Jessamy v. City of New Rochelle, New York, 292 F. Supp. 2d 498, 511 n.15 (S.D.N.Y. 2003)* [*35] (citing *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000)*; *Sorlucco v. N.Y. City Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989)*). This analysis requires the plaintiff to first establish a prima facie case of discrimination. See, e.g., *Weinstock, 224 F.3d at 42*.

Case 3:03-cv-00914-DJS    Document 56-15    Filed 03/26/2004    Page 16 of 18

Page 9
2004 U.S. Dist. LEXIS 1561, *35

As the court concluded with regard to the Title VII claims, Grey presents sufficient facts in support of her racial discrimination claim to state a prima facie case. See supra at 1415 . Grey has thus presented ample evidence to proceed to trial on her equal protection claim of race-based discrimination.

### a. § 1983/Race (Board)

The Board may not be held liable under *§ 1983* for the actions of individuals solely on a theory or respondeat superior. *Jeffes v. Barnes, 208 F.3d 49, 56-57 (2d Cir. 2000)* (citing *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)).* The Second Circuit has found that a municipality may be held liable under *§ 1983* when the injury was inflicted by its "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." [*36] *Jeffes, 208 F.3d at 57.* Additionally, a supervisor's acquiescence to the actions of his subordinates may amount to a policy or custom, if the subordinate's "discriminatory practice [is] so manifest as to imply the constructive acquiescence of senior policy-making officials." *Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 137 (2d Cir. 1999)* (citing *Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992).* When a subordinate's decision is subject to review by the municipality's authorized policy makers, "their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988).* Grey may thus hold the Board liable under *§ 1983* for discriminatory treatment by Herbert and Riccio, if she can demonstrate that the Board "knew of and ratified the discrimination." *Looby, 152 F. Supp. 2d at 187* (citing *Monell,436 U.S. at 690-91).*Here, Grey alleges that Board members advised her to get a lawyer because she was a victim of racial discrimination, and that one member commented [*37] that "he predicted that all minorities would be eliminated from the Central Office by Victor Herbert." Grey Aff. at P39. The Board failed to act to remedy the discrimination, and eventually ratified what Grey claims was her constructive discharge. These facts, if proven to the jury, are a sufficient basis to find the Board liable for Herbert's and Riccio's conduct under *§ 1983.*

### b. Qualified Immunity/ § 1983/Race (Riccio and Herbert)

Finally, the defendants argue that Riccio and Herbert are entitled to qualified immunity on Grey's *§ 1983* race discrimination claim. n5 A government official sued in his individual capacity is entitled to qualified immunity for a constitutional violation if, considering the record as construed in the plaintiff's favor, the constitutional right in question was not "clearly established" at the time of the conduct, or if the official's action was objectively reasonable. See *Saucier v. Katz, 533 U.S. 194, 201, 150 L. Ed. 2d 272, 121 S. Ct. 2151; X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 65-66 (2d Cir. 1999).* The question is "what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999)* [*38] (citation omitted).

> n5 The court only considers qualified immunity on the race discrimination claim because it is the only remaining *§ 1983* discrimination claim.

Grey's right to be free from discrimination because of her race was well-established at the time of the events that gave rise to this suit. See, e.g., *Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 316 n. 3, 53 L. Ed. 2d 768, 97 S. Ct. 2736 (1977) (fourteenth amendment forbids racial discrimination even before enactment of Title VII).* Nor would a "reasonable" official, especially in light of the long-established and well-known law on the subject, have thought that it was acceptable to treat Grey differently because of her race. *Looby, 152 F. Supp. 2d at 189.* Rather, the essence of what the defendants raise is a dispute of fact about whether Grey was in fact treated differently. This is properly left to the jury.

### 3. § 1983 Sex and National Origin Discrimination (All Defendants)

As discussed above, the plaintiff [*39] has not put forward sufficient evidence to support a prima facie case of sex discrimination or national origin discrimination. See supra at 9-11, 15-16. Summary judgment is thus granted on Grey's *§ 1983* national origin and sex discrimination claims.

### E. Negligent Infliction of Emotional Distress (All Defendants)

The defendants also move for summary judgment on Grey's negligent infliction emotional distress claim in Count Four of the Complaint, arguing that the Connecticut Supreme Court's decision in *Perodeau v. City of Hartford, 259 Conn. 729, 792 A.2d 752, 764-773 (2002),* bars claims for negligent infliction of emotional distress arising out of conduct occurring in the context of a continuing employment relationship, as opposed to conduct that occurs in the process of a termination of employment.

The defendants argue that Grey's Count Four allegations do not reference her claim of constructive discharge. However, paragraph fifty-four, the first paragraph in Count Four, incorporates "the allegations contained in paragraphs 1 through 53 of the Complaint as though re-

stated herein word for word," thus incorporating Grey's constructive discharge claim [*40] into Count Four. The question presented, then, is whether constructive discharge qualifies as termination of employment for purposes of a negligent infliction of emotional distress claim.

The application of constructive discharge to a claim of negligent infliction of emotional distress presents a novel issue in light of Perodeau. By limiting the scope of the negligent infliction of emotional distress tort to conduct occurring in the process of termination, the Perodeau court aimed to limit the reach of the tort. *Perodeau, 259 Conn. at 756, 792 A.2d 752* ("the problem for the law is to limit the legal consequences of wrongs to a controllable degree"). The court explained that its combination of the termination requirement with its prior decisions to allow a negligent infliction of emotional distress claim made sense because, "implicit in this conclusion is a recognition that emotional distress that might result in illness or bodily harm is a foreseeable consequence of particularly egregious conduct involving a termination, which would, in turn, give rise to a duty to avoid such conduct." *Id. at 755*. The court further acknowledged that "individuals in the [*41] workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace." *Id. at 757*.

The court noted that making such distress actionable in the context of continuing employment would have several negative consequences:

> Employees who fear lawsuits by fellow employees may be less competitive with each other, may promote the interests of their employer less vigorously, may refrain from reporting the improper or even illegal conduct of fellow employees, may be less frank in performance evaluations, and may make employment decisions such as demotions, promotions and transfers on the basis of fear of suit rather than business needs and desires. All of this conduct would contribute to a less vigorous and less productive workplace.

*Id. at 758*.

Allowing an employee alleging constructive discharge to assert a negligent infliction of emotional distress claim does not implicate these concerns. In a constructive discharge case such as the one alleged by Grey, the employment relationship is already terminated, allegedly involuntarily. As a result, the effect [*42] of allowing the claim is no different than if the plaintiff had been actually discharged: there is none of the additional "chilling," or "fear" that motivated the Connecticut Supreme Court to preclude the tort from being asserted in ongoing employment relationships. Moreover, in Connecticut, a "constructive discharge is effectively the legal equivalent of a discharge." *Kilduff v. Cosential, Inc., 289 F. Supp. 2d 12, 18 (D. Conn. 2003)*(quoting *Seery v. Yale-New Haven Hosp., 17 Conn. App. 532, 554 A.2d 757 (Conn. App. 1989))*. Thus allowing a constructive discharge to form the basis of a negligent infliction of emotional distress claim is consistent with Connecticut constructive discharge law. Accord *Gupta v. City of Norwalk, 221 F. Supp. 2d 282, 295 n.6 (D. Conn. 2002)*(Thompson, J.)(noting without deciding that a constructive discharge claim would support a negligent infliction of emotional distress claim).

However, the alleged conduct is not sufficiently unreasonable or wrongful to support the negligent infliction of emotional distress claim. Indeed, wrongful motivation is not enough to sustain the claim: "the mere act of firing an [*43] employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." *Parsons v. United Technologies Corp., 243 Conn. 66, 88-89, 700 A.2d 655*. Instead, "negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process." *Id. at 88* (internal quotation marks omitted); *Perodeau, 259 Conn. at 750, 792 A.2d 752*.

Here, Grey alleges that Herbert lied to the Board about Grey's buyback, telling them that it had been her proposal; that he had his secretary type her termination letter and then denied its existence; that Herbert told her she was "finished" and not to report to work, even though the buyback was not yet approved and completed. Moreover, Grey claims that these and other actions were based on her race. The allegations against Riccio involve warnings that her job would be eliminated, an accusation that he usurped her authority in front of her subordinates, and that he manipulated her curricular responsibilities and the associated funds so as to impede her job. The Board allegedly knew of the wrongfulness of [*44] their actions and ratified them. These activities, while wrongful, are not "sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of emotional distress." *Perodeau, 259 Conn. at 751, 792 A.2d 752* ; see also *Morris v. Hartford Courant Co., 200 Conn. 676, 680, 513 A.2d 66 (Conn. 1986)*(false accusations were not outrageous where plaintiff did not allege that employer knew they were false or made the accusations with reckless disregard)(emphasis added). Summary judgment is granted on Count 4.

### III. CONCLUSION

For the reasons discussed above, the defendants' mo-

tion is GRANTED: on the First Cause of Action as to all claims against Herbert and Riccio, individually; on the age discrimination claim, national origin discrimination claim, and sex discrimination claim as to all defendants; on the Second Cause of Action, as to all claims against Herbert and Riccio individually, and as to Grey's sex discrimination claim, age discrimination claim, and national origin discrimination claim as to all defendants; on the Third Cause of Action as to the sex discrimination claim and national origin discrimination claims [*45] against all defendants; and on the Fourth Count against all defendants. The remainder of the motion is DENIED. Claims remain against Riccio and Herbert for race discrimination in violation of the *fourteenth amendment*, pursuant to *§ 1983*; and against the Board for constructive discharge and hostile work environment race discrimination in violation of Title VII and of the *fourteenth amendment*, pursuant to *§ 1983*.

SO ORDERED

Dated at Bridgeport, Connecticut this 4th day of February, 2004.

/s/ Janet C. Hall

Janet C. Hall

United States District Judge