# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **PETER COCCARO,** | : | |
| **SR.,** | : | **CIVIL ACTION NO.:** |
| | : | |
| **Plaintiff,** | : | **3:03 CV 914 (DJS)** |
| | : | |
| **vs.** | : | |
| | : | |
| **AT&T CORPORATION,** | : | |
| | : | |
| **Defendant.** | : | **April 21, 2004** |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY REVISED COMPLAINT

## I.    INTRODUCTION

Under Federal Rule 56(c), summary judgment is appropriate when the record demonstrates that there is no genuine issue of material fact to be tried and it is apparent that no rational jury could find in favor of the non-moving party.  Dister v. Continental Group, Inc., 859 F.2d 1108 (2d Cir. 1988).  In the instant case, there are material issues of fact in dispute upon which a jury could rely to conclude that the defendant, AT&T, discriminated against the plaintiff, Peter Coccaro, on the basis of his age.  Thus, under Rule 56(c), defendant's summary judgment motion should be denied.

## II.    FACTS

The plaintiff, Peter Coccaro, was born on November 3, 1942 and is currently 62 years old.  Prior to June, 2001 Coccaro worked as a salesman for a company called AA&T (Coccaro Dep. 37).  Coccaro had worked for AA&T for approximately eight years but decided to leave to

find something better.  (Coccaro Dep. 37).  Coccaro applied to AT&T and, after a series of interviews, he was hired. (Coccaro Dep. 50-60).

Coccaro began his employment with AT&T on June 25, 2001 as a Voice Account Manager in the Growth Markets Department. (Coccaro Dep. 62-63).  Initially, his supervisor was John Swarts. (Coccaro Dep. 64; LaCroce Dep. 50).

For the first three months of his employment, Coccaro had to complete AT&T's training course for new employees. (Coccaro Dep. 66-70 ).  The course taught employees about the AT&T products they would be selling. (Coccaro Dep. 67).  After completing the three month training course (June, July and August), Coccaro assumed his sales duties in September, 2001. (Coccaro Dep. 70).  Shortly thereafter, Coccaro's manager, John Swarts, was replaced and Coccaro began reporting to a different manager, Joe LaCroce. (Coccaro Dep. 78 )  LaCroce, who was in his mid-thirties at the time,[1] had no role in interviewing or hiring Coccaro. (LaCroce Dep. 48-49).  LaCroce did not meet Coccaro until after Coccaro joined AT&T. (LaCroce Dep. 48-49).

LaCroce began supervising Coccaro in September, 2001. (LaCroce Dep. 8).  Immediately after LaCroce started managing the department, he met with his subordinates, including Coccaro. (Coccaro Dep. 78-79).  LaCroce told Coccaro that Coccaro should have been attempting to sell and attempting to build his customer base during the three month training course. (Coccaro Dep. 77-79).  No one else at AT&T said so, however. (Coccaro Dep. 78).  To the contrary, Coccaro had been given a document setting forth his sales quota and the document indicated that Coccaro's sales quota for his three month training period (June, July, and August) was zero. (Exhibit 1).

---

[1]LaCroce was 39 in February 2004 and approximately 36 in 2001. (LaCroce Dep. 53).

AT&T has a practice of giving a base of customer accounts to its sales people. (Coccaro Dep. 77). In AT&T lingo, that group of base accounts is referred to as a "module." (Coccaro Dep. 77). Immediately after LaCroce became Coccaro's manager, Coccaro informed him that he had not yet received a "module." (Coccaro Dep. 79). Nevertheless, LaCroce did not give him a module. (Coccaro Dep. 262).

In contrast, several of Coccaro's younger co-workers specifically informed Coccaro that they had received modules after they completed their training programs. (Coccaro Dep. 182). For instance, John Cibulay, who was in his mid-thirties and substantially younger than Coccaro, informed Coccaro that he had been given a module. (Coccaro Dep. 182, 261). LaCroce testified that, after he became Cibulay's supervisor, he (LaCroce) assigned Cibulay a module. (LaCroce Dep. 56-57). The module consisted of one account worth one million dollars. (LaCroce Dep. 56-57). Ray Waldman was in his mid-thirties and was substantially younger than Coccaro. (Coccaro Dep. 262; LaCroce Dep. 54). Waldman had received a module. (Coccaro Dep. 262; LaCroce Dep. 56). Dan Keenan was in his mid-forties and substantially younger than Coccaro. (Coccaro Dep. 262). Keenan had received a module. (Coccaro Dep. 262; LaCroce Dep. 56).

When John Swarts was still managing Coccaro, a sales person named Virginia Trinque took a leave of absence for surgery. (Coccaro Dep. 80). Swarts asked Coccaro if he could "babysit" Trinque's accounts during her absence. (Coccaro Dep. 81). Swarts just wanted to make sure that nothing fell between the cracks while Trinque was out. (Coccaro Dep. 81). This was acceptable to Coccaro because AT&T, Trinque, and Coccaro all believed that Trinque would only be out for a couple of weeks. (Coccaro Dep. 82). The effort only required Coccaro to respond to incoming calls on Trinque's account. (Coccaro Dep. 81).

When LaCroce became Coccaro's manager, Coccaro informed LaCroce that he had been babysitting Trinque's accounts. (Coccaro Dep. 79). Thereafter, LaCroce met with Trinque and Trinque told him that she was going on a disability leave. (LaCroce Dep. 62). LaCroce informed Coccaro that Trinque's absence was going to be longer than expected. (Coccaro Dep. 82). Yet, Coccaro continued to babysit Trinque's accounts and his involvement became more and more time consuming. (Coccaro Dep. 116-17, 198). For instance, sixty percent of Coccaro's day was spent on the telephone and half of that time was spent dealing with Trinque's customers. (Coccaro Dep. 116-17). Once it became apparent that Trinque's absence would be prolonged and that Coccaro would be required to invest a significant amount of time on her customers, the arrangement became a problem for Coccaro. (Coccaro Dep. 116-17). Coccaro was spending time working on Trinque's accounts but not getting credit for the work. (Coccaro Dep. 194-95). Coccaro should have been working full time on his own accounts. (Coccaro Dep. 195). During this time, Coccaro continued to ask LaCroce for his own module but was unable to obtain one. (Coccaro Dep. 84, 262).

Coccaro was under pressure from LaCroce to prospect accounts and generate revenue. In one of their first meetings, Coccaro informed LaCroce that he had a very good relationship with a high level representative at a company called Stolt Nielsen. (Coccaro Dep. 119, 122; LaCroce Dep. 145-46). LaCroce told Coccaro that AT&T had been trying to get the Stolt Nielsen account for years and asked Coccaro who he knew at Stolt Nielsen. (Coccaro Dep. 120; LaCroce Dep. 145). Coccaro told him that he knew the Vice President of Management Information Systems ("MIS") and LaCroce replied "well, that is the right guy." (Coccaro Dep. 120). LaCroce told Coccaro that he thought the Stolt Nielsen account was assigned to someone else but he would see

what he could do. (Coccaro Dep. 120).  Since Stolt Nielsen was assigned to another salesman, Coccaro needed permission to call Stolt Nielsen, even though the other salesman had failed to make inroads with Stolt Nielsen.  (LaCroce Dep. 147-50).  When Coccaro followed up with LaCroce about whether he could go after Stolt Nielsen, LaCroce told him "we will let you know when we are ready." (Coccaro Dep. 120).  However, at no point did LaCroce get back to Coccaro.  Stolt Nielsen had the potential to generate a large amount of revenue for Coccaro and AT&T. (Coccaro Dep. 159).

Illustrating one of the material facts in dispute in this case, LaCroce had a slightly different recollection of the Stolt Nielsen situation.  LaCroce recalled that Coccaro had told him that he had a connection at Stolt Nielsen. (LaCroce Dep. 146).  LaCroce confirmed that Stolt Nielsen was a very large account and that no one at AT&T, including LaCroce, had been able to crack the Stolt Nielsen account. (LaCroce Dep. 146-50).   LaCroce recalled that a salesman in a different territory was trying to make inroads with Stolt Nielsen but was not meeting with success. (LaCroce Dep. 148-50).  Although LaCroce did not specifically recall having done so, he testified that it would have been his normal practice to call the manager of the other sales territory, obtain permission for his salesman (Coccaro) to call on the account, and then work out some sort of revenue split between the two territories. (LaCroce Dep. 147-48).  LaCroce confirmed that it would have been inappropriate for Coccaro to call Stolt Nielsen without the permission of the other sales territory. (LaCroce Dep. 147-50).  Although LaCroce could not recall getting permission from the other sales territory, he allegedly recalled giving Coccaro

permission to call Stolt Nielsen, a fact which Coccaro disputes.[2] (LaCroce Dep. 147-49).  In any event, after allegedly giving Coccaro permission to call Stolt Nielsen, a very large account that no one at AT&T had been able to crack, LaCroce could not recall having any follow-up conversations with Coccaro about the Stolt Nielsen account or about the progress Coccaro was making on Stolt Nielsen. (LaCroce Dep. 151).  Whether LaCroce, in fact, gave Coccaro permission to call on Stolt Nielsen is a disputed fact which goes to the heart of Coccaro's alleged non-production.

In late October, 2001, Coccaro had a meeting with Erin Cruschel in Human Resources. (Coccaro Dep. 187-89).  Coccaro informed her that he had not been assigned a module. (Coccaro Dep. 188).  Cruschel responded with words to the effect that human resources was not the right place to raise such an issue but, instead, it should be raised with Coccaro's manager, LaCroce. (Coccaro Dep. 190).

Shortly thereafter, on November 9, 2001, LaCroce placed Coccaro on a Performance Improvement Plan ("PIP").  Crushel was involved in the decision to do so.  (LaCroce Dep. 105). At AT&T, an employee is supposed to be placed on a PIP if he or she is under 70% of his or her year-to-date sales goal. (Lacroce Dep. 29).  The determination as to whether an employee will be placed on a PIP is supposed to be made each and every month. (Lacroce Dep. 29).  If an employee dips below 70% of his or her year-to-date goal, the employee has to be put on a PIP. (Lacroce Dep. 30).

---

[2]     After the describing the process which he normally followed to get permission for one of his salesmen to call on another salesman's account, LaCroce stated "that is how it generally works.  I don't know if in this particular case, that took place." (LaCroce Dep. 148).

A PIP contains different phases.  (Lacroce Dep. 31). The first phase, known as Phase A, is a warning phase. (Lacroce Dep. 31). Under Phase A, the employee is given 30 days to improve his or her performance.  (Lacroce Dep. 31).  To do so, the employee must achieve his year to date goal. (LaCroce Dep. 97-98, 101).  If the employee fails to meet his or her goal, he or she moves to Phase B, under which the employee can elect from two options:  (1) to try to make his or her year-to-date goal over the next 30 days or (2) use the next 30 days, with pay, to search for a job outside of AT&T. (Lacroce Dep. 31, 101).   If the employee chooses option (1) but fails to achieve his goal, he is terminated.[3]  (LaCroce Dep. 32).

As of November 9, 2001, Coccaro had been employed by AT&T for slightly under 6 months but he had not sold anything.  LaCroce told Coccaro that, in order to satisfy Phase A of the PIP, he would be required to make his year to date goal and that meant that the money actually had to come in by the end of the 30 day period. (Coccaro Dep.141-43; Exhibit 3).

At the end of the 30 day period, Coccaro did not make his goal so it was time for him to discuss Phase B of the PIP. (Coccaro Dep. 146).  On that day, when Coccaro arrived at the office, he noticed that the building security code had been changed. (Coccaro Dep. 153).  Coccaro could not get into the building so he had to wait for someone to let him in. (Coccaro Dep.153).

---

[3]    Employees who have been employed by AT&T longer than 6 months get an extra layer which, in essence, gives them three phase, which progress in 30 day increments. (Lacroce Dep. 31; Exhibit 2).  An employee with more than 6 months gets a corrective action letter (giving him 30 days to meet the year-to-date goal). If the employee fails to meet the year-to-date goal within the 30 days, he or she is placed on Phase A of the PIP, giving the employee another 30 days to meet the current year-to-date goal.  If the employee fails to do so within the 30 day period, he or she moves to Phase B, which results in termination of the goal hasn't been met. (Lacroce Dep. 29-31; Exhibit 2).  The phases are mandatory. (Lacroce Dep. 30).

Coccaro met with LaCroce that day and LaCroce offered him Phase B of the PIP: (a) a 30 day paid job search followed by termination or (b) 30 days to achieve Coccaro's entire year-to-date goal. (Coccaro Dep. 149). LaCroce told Coccaro that Phase B did not serve as a guarantee that Coccaro would be kept on for the full 30 day period. (Coccaro Dep. 150). Rather, LaCroce explained that, if at any point during the 30 day period LaCroce decided to let Coccaro go, he could do so under Phase B of the PIP. (Coccaro Dep. 150). In light of the circumstances, Coccaro was not willing to take the risk and opted for the 30 day job search followed by termination. (Coccaro Dep. 150). Coccaro surrendered his computer and files to LaCroce, cleaned out his desk, and left the building. (Coccaro Dep. 152). Coccaro was 59 years old at the time of his termination. (Coccaro Dep. 260).

After Coccaro was terminated, LaCroce brought a new salesman into his group, Hugh Sullivan.[4] (LaCroce Dep. 153). Sullivan was younger than Coccaro. (Exhibit 4, ¶ 8). Additionally, a couple of months after Coccaro's termination, Virginia Trinque, who is approximately 12 years younger than Coccaro[5], returned from her disability leave and took over

---

[4]    The sales people under LaCroce handled either AT&T voice products or AT&T data products. Coccaro handled voice products while he was there. After Coccaro's last day in the office, Hugh Sullivan moved into LaCroce's department, handling AT&T voice products. LaCroce does not consider Sullivan to be Coccaro's replacement because LaCroce had two vacancies in his department (Coccaro's slot and another). LaCroce regarded Sullivan as filling the other vacancy, not Coccaro's. (LaCroce Dep. 153-55). This presents a question of fact. On summary judgment, all ambiguities and inferences must be drawn in favor of the party against whom summary judgment is sought. Danzer v. Norden Systems, Inc., 151 F.3d 50, 54 (2d Cir. 1998); Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223-1224 (2d Cir. 1994).

[5]    Trinque turned 50 in February, 2004, making her approximately 12 years younger than Coccaro. (LaCroce Dep. 52).

the very same module that LaCroce denies Coccaro was merely babysitting. (LaCroce Dep. 155).

In connection with his termination from AT&T, Coccaro was first placed on a PIP, pursuant to AT&T's policy. The PIP is, in essence, AT&T's progressive discipline policy for salespeople who are underproducing. Although the PIP policy is supposed to be uniformly and equally applied and its requirements are allegedly mandatory, (Lacroce Dep. 29-30), the policy was inconsistently applied to Coccaro when compared to a younger salesman, John Cibulay. In this regard, Cibulay received more favorable treatment than Coccaro with respect to his failure to generate revenue.

An employee must be placed on a PIP any time he or she dips below 70% of his or her year-to-date sales quota. (Lacroce Dep. 29). The determination as to whether to place an employee on a PIP is supposed to be made each and every month and, if the employee falls below the 70% figure, placement on a PIP is mandatory. (Lacroce Dep. 30). Cibulay was hired by AT&T in March, 2001, three months before Coccaro. (Coccaro Dep. 261; LaCroce Dep. 54). For the first six months of his employment, Cibulay failed to sell anything. (Coccaro Dep. 99, 162; LaCroce Dep. 122, Exhibit 5, 6, and 7).[6] Yet, Cibulay was not placed on a PIP, despite the fact that one would have been mandatory under the circumstances. (LaCroce Dep. 30).

In sharp contrast, Coccaro was placed on a PIP before he even reached his fifth month anniversary at AT&T.[7] During Cibulay's first six months, he sold nothing and was not placed on

---

[6]     Exhibit 5, 6 and 7 are the monthly scorecards showing each account executive's production. Cibulay's year-to-date attainment in July (Exhibit 5), August (Exhibit 6) and September (Exhibit 7) was zero.

[7]     Coccaro was hired on June 25, 2001 (Coccaro Dep. 62) and placed on the PIP on November 9, 2001 - - 4 ½ months after being hired.

a PIP. Coccaro never made it to his sixth month anniversary, insofar as he was terminated on December 10, 2001.[8]  Coccaro made a sale during his first 5 ½ months of employment at AT&T but AT&T's brief characterizes that sale as minor.  Cibulay, however, sold nothing during his first 6 months and no adverse consequences occurred as result. Cibulay, who was younger than Coccaro, was given more time to produce that Coccaro.  In this regard, Cibulay, unlike Coccaro, had been given a module worth one million dollars.  (LaCroce Dep. 56-57).

In his seventh month, (October, 2001), Cibulay made a sale but it was not sufficient to satisfy 70% of his year-to-date quota. (Exhibit 8).[9]  At that point, Cibulay had just crossed the six month threshold, so AT&T's policy required LaCroce to give Cibulay a corrective action letter. (LaCroce Dep. 29-31).  Yet, LaCroce did not.

In Cibulay's eighth month at AT&T, (November, 2001), Cibulay had still not achieved the 70% year-to-date goal. (Exhibit 9).[10]  Yet, Cibulay was still not given a corrective action letter.  By November, if the "mandatory" PIP policy had been applied to Cibulay, Cibulay would have been well beyond the corrective action letter, assuming he was still employed at all.  Yet, LaCroce did not even give him the corrective action letter. Cibulay was in his mid-thirties and significantly younger than Coccaro. (Coccaro Dep. 261).

---

[8]     Coccaro was then kept on the books for 30 days, pursuant to Phase B of the PIP but he never stepped foot in the building or rendered services for AT&T after December 10, 2001.  (Coccaro Dep. 152). Indeed, the security code for the building had been changed such that Coccaro could not enter the building. (Coccaro Dep. 153).

[9]     Cibulay's year-to-date attainment in October (Exhibit 8) was 17% and his monthly attainment was 33%.

[10]    Cibulay's year-to-date attainment in November (Exhibit 9) was 20% and his monthly attainment was 20%.

III.    **DISCUSSION OF LAW**

A.    **Standard for Ruling on Summary Judgment**

Federal Rule of Civil Procedure 56©) provides that summary judgment shall be granted only when a review of the entire record demonstrates "that there is no genuine issue of material fact" to be tried.  Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986); Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 57 (2d Cir. 1987).  The moving party has the burden of proving  that there is no genuine issue of material fact to be tried.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Gallo v. Prudential Residential Services, Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).  To grant summary judgment, "there must either be a lack of evidence in support of plaintiff's position...or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error."  Danzer v. Norden Systems, Inc., 151 F.3d 50 (2d Cir. 1998)(citations omitted).

In determining whether there is a genuine issue of material fact, the court, on summary judgment, must resolve any and all inferences and ambiguities in favor of the party opposing summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Gallo, 22 F.3d at 1223.  If there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper.  Cronin v. Aetna Life Insur. Co., 46 F.3d 196, 203 (2d Cir. 1995).

The drastic remedy of a summary judgment dismissal is disfavored in employment cases. The Second Circuit has made it very clear that parties seeking summary judgment bear a heavy burden and that the burden is even heavier in employment cases.  The Second Circuit has stated:

[c]onsidering how often we must reverse a grant of summary judgment, the rules for when this provisional remedy may be used apparently need to be repeated . . . *all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought* . . . . [W]hen deciding whether this drastic provisional remedy should be granted in a discrimination case, additional considerations should be taken into account. A trial court must be cautious about granting summary judgment when, as here, its intent is at issue.  Because writings directly supporting a claim of discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.  (The court's duty) in short, is confined at this point to issue-finding; it does not extend to issue resolution.

Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223-1224 (2d Cir. 1994) (emphasis added).

### B.     Coccaro Has Established a Claim for Age Discrimination

The federal ADEA and the Connecticut FEPA make it unlawful for an employer to discharge any individual because of his age. 29 U.S.C. §623(a)(1); Conn. Gen. Stat. §46a-60(a).[11] The ADEA and FEPA are violated if an employee's age played any role in the employer's decision to discharge him.  Renz v. Grey Advertising, Inc., 135 F.3d 217 (2d Cir. 1997).  For a violation of the ADEA or FEPA to exist, age does not have to be the only or sole motivating factor behind the termination decision.  Instead, the ADEA and FEPA are violated if age plays **any** role in or contributes to the decision.  Renz v. Grey Advertising, Inc., 135 F.3d 217, 222 (2d Cir. 1997)(emphasis added).

Because direct evidence of discrimination or "smoking gun" evidence rarely exists, plaintiffs generally prove discrimination cases using the three part burden shifting analysis set

---

[11]     As Defendant's brief correctly points out, the Connecticut Fair Employment Practices Act is construed in the same manner as the federal ADEA. Wroblowski v. Lexington Garden, Inc., 188 Conn. 44, 53 (1982).  Thus, Plaintiff's brief will analyze the state and federal claims together.

forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case which creates an inference of discrimination. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000). The burden of production then shifts to the defendant to produce a legitimate non-discriminatory reason for its conduct. <u>Reeves</u>, 530 U.S. at 142. If the defendant does so, the inference of discrimination created by the *prima facie* case drops out of the picture. <u>Reeves</u>, 530 U.S. at 142-43. The plaintiff then has the burden of proving that the reason proffered by the defendant is unworthy of credence. <u>Reeves</u>, 530 U.S. at 143.

"Although the presumption of discrimination 'drops out of the picture once the defendant meets its burden of production,' (citation omitted), the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case 'and inferences properly drawn therefrom... on the issue of whether the defendant's explanation is pretextual.'" <u>Reeves</u>, 530 U.S. at 143 (quoting <u>St. Mary's</u>, 509 U.S. at 510-11). Thus, in sustaining his ultimate burden, "the plaintiff need not submit additional evidence to demonstrate discrimination, but can rely solely on the evidence establishing the *prima facie* case and the inferences drawn therefrom." <u>Dais v. Lane Bryant, Inc.</u>, 2001 WL 1328390 *2 (S.D.N.Y. 2001)(citing <u>St Mary's</u>, 509 U.S. at 511). In this respect, "proof that the defendant's explanation is unworthy of credence is simply <u>one form</u> of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." <u>Reeves</u>, 530 U.S. at 147 (emphasis added). Proof that the defendant's reason is unworthy of credence, however, is certainly not the only manner in which a plaintiff can prove the ultimate fact of discrimination. "An invidious discriminatory purpose may often be inferred from the totality of the relevant facts." <u>Washington v. Davis</u>, 426 U.S. 229, 242 (1976).

Under McDonnell Douglas, an employee can establish a *prima facie* case of age discrimination by showing that (a) he is over 40, (b) qualified to perform his job functions, (c) he was fired, and (d) that his termination occurred under circumstances giving rise to an inference of age discrimination. Levin v. Analysis & Technology, 960 F.2d 314, 316 (2d Cir. 1992). As to the final element, the most common way for a plaintiff to show circumstances giving rise to an inference of age discrimination is to show that after his termination a substantial part of his duties were assumed by a younger person. Hollander v. American Cyanamid Co., 895 F.2d 80 (2d Cir. 1990); Montana v. First Fed. Sav. & Loan, 869 F. 2d 100 (2d Cir. 1989), Wolfe v. Time, Inc., 702 F. Supp. 1045 (S.D.N.Y. 1989).

In this case, it is undisputed that Coccaro was over 40 years old at the time of his termination. He was 59 years old on the date of termination. (Coccaro Dep. 260).

Coccaro was qualified to perform the functions of his job. In this regard, Coccaro need only show that he met the minimal qualifications for his position. Owens v. New York City Housing Auth., 934 F.2d 405 (2d Cir. 1991) cert denied 112 S.Ct. 431 (1991); Logan v. St. Luke's Hosp. Center, 636 F. Supp. 226, 233 (S.D.N.Y. 1986). Coccaro had several years experience as a salesman, including eight years at a company called AA&T (Coccaro Dep. 37), and he passed AT&T's training course with good marks. (Coccaro Dep. 69, 79).

As to the third element of the *prima facie* case, Coccaro was terminated.

As to the final element, Coccaro's termination occurred under circumstances giving rise to an inference of age discrimination. After Coccaro was terminated, a new sales person named

Hugh Sullivan joined LaCroce's group.[12] (LaCroce Dep. 153-55).  Sullivan was younger than

Coccaro, (Exhibit 4, ¶8).  The salespeople under LaCroce handled either (a) AT&T voice

products or (b) AT&T data products.  (LaCroce Dep. 153-55).  Coccaro had handled AT&T

voice products.  After Coccaro was terminated, Sullivan was brought on to handle voice products

as well. (LaCroce Dep. 153-55).

Since Coccaro has established a *prima facie* case of age discrimination under the ADEA

and FEPA, the burden shifts to AT&T to articulate a legitimate non-discriminatory reason for his

discharge.[13]  Reeves, 530 U.S. at 142.  AT&T has done so by alleging that Coccaro was

terminated for poor performance.  Coccaro can produce evidence of pretext, however.  In this

regard, both the United States Supreme Court and the Second Circuit have made clear that

evidence that employees outside of the protected class were treated more favorably than

---

[12]    AT&T's Brief argues that Sullivan joined LaCroce's group while Coccaro was still employed by AT&T so he cannot be considered Coccaro's replacement. Although Coccaro remained on the books until January 10, 2002, it was because Phase B of the PIP provided for a 30 day paid job search before the termination became effective. (Lacroce Dep. 31, 101).  It is undisputed though that Coccaro had received definite notice of termination on December 10, 2001.  On that day, he surrendered his AT&T property and ceased performing services for AT&T. (Coccaro Dep. 152).  The security code for the building had even been changed such that Coccaro could not gain access. (Coccaro Dep. 153).  When Sullivan joined LaCroce's group on December 23rd, Coccaro was gone. Contrary to AT&T's assertion, Sullivan replaced Coccaro.  The court, on summary judgment, must resolve any and all inferences and ambiguities in favor of the party opposing summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[13]    AT&T's brief argues that it could not have discriminated against Coccaro based on his age because he was hired less than one year before he was fired. However, the undisputed evidence shows that the actor who terminated Coccaro (LaCroce) had no role whatsoever in hiring him. (LaCroce Dep. 48-49).  Thus, although AT&T has not explicitly argued so, this is not a case involving the "same actor inference."

employees inside the protected class constitutes evidence of pretext and is sufficient to sustain

the ultimate burden of proof in a discrimination case.  McDonald v. Santa Fe Trail

Transportation Co., 427 U.S. 273 (1976); McDonnel Douglas Corp. v. Green, 411 U.S. 792

(1973); Burger v. NY Institute of Technology, 94 F.3d 830 (2d Cir. 1996); Montana v. First

Federal Savings & Loan of Rochester, 869 F.2d 100, 106-07 (2d Cir. 1989)(Plaintiff may support

an inference of discrimination by showing that non-protected class members were treated more

favorably).  In the instant case, there is evidence of such differential treatment.

### 1.    Coccaro Was Not Assigned a Module, Whereas Younger Employees Were

John Cibulay was in his mid-thirties and substantially younger than Coccaro.  (Coccaro

Dep. 261).  Cibulay was assigned a module by LaCroce. (LaCroce Dep. 56-57).  The module

consisted of one account worth one million dollars. (LaCroce Dep. 56-57).  In contrast, Coccaro

was not assigned a module.  In this regard, there is a material factual dispute. LaCroce alleges

that he permanently reassigned Virginia Trinque's module to Coccaro when Trinque went out on

disability leave. (LaCroce Dep. 62-63).  LaCroce testified that he notified Trinque of the

permanent reassignment but he did not know whether he notified Coccaro of the alleged

permanent reassignment. (LaCroce Dep. 62-63).  It is odd that LaCroce would not recall whether

he notified Coccaro of the alleged reassignment in light of the fact that Coccaro had been asking

LaCroce for his own module.

In support of his allegation that he reassigned Trinque's module to Coccaro, LaCroce

relies on a list of Trinque's accounts which were supposedly reassigned to Coccaro. (Exhibit

10).[14]  LaCroce claims that he handed the list to Coccaro while Coccaro was still employed by AT&T. (LaCroce Dep. 64).  The document lists Trinque's accounts but has Peter Coccaro's first name next to them. (Exhibit 10).  When shown the list at his deposition, Coccaro testified that he had never been shown Exhibit 10 in the fashion in which it appeared at his deposition. (Coccaro Dep. 175).  Rather, the document that was given to him in December, 2001, still identified Virginia Trinque as the A.E. (Account Executive) and listed Trinque's four digit identification code.[15]  (Coccaro Dep. 175, 177).  In contrast, Exhibit 10 lists Coccaro's first name next to the accounts but still uses Trinque's four digit code– known as the INPID. (Coccaro Affidavit).

Additionally, despite LaCroce's allegation that he permanently assigned all of Trinque's accounts to Coccaro, Coccaro testified that LaCroce specifically instructed him not to visit some of the accounts on Trinque's list, including People's Bank, Beiersdorf, and American Scandia. (Coccaro Dep. 195, 200).  In this regard, one of Coccaro's close childhood friends did business with Beiersdorf and, had Coccaro been allowed to visit them, Coccaro could have easily gotten into the account and met with the right person. (Coccaro Dep. 196).  The instruction not to visit some of the accounts on Exhibit 10 is consistent with Coccaro's allegation that he was merely babysitting the accounts until Trinque returned from leave.

---

[14]     Some of the accounts listed on Exhibit 10 were accounts that Coccaro brought on board himself. (Coccaro Dep. 200). Such accounts included Act Media and ISL Marketing. (Coccaro Dep. 200). Trinque had no role in bringing those accounts on board so it cannot truly be said that LaCroce "transferred" or re-assigned them to Coccaro. (Coccaro Dep. 200).

[15]     Every employee at AT&T gets a four digit identification code which is plugged into AT&T's computer system. (LaCroce Dep. 67).  The code appears in the INPID column of Exhibit 10.  (LaCroce Dep. 67).

Perhaps the strongest evidence to support the conclusion that Coccaro was merely babysitting Trinque's accounts until she returned is that, a couple of months after Coccaro was fired, Trinque actually returned to work and re-assumed all of her accounts. (LaCroce Dep. 155).

**2.      Younger Employees Were Treated More Favorably With Respect to Their Failure to Generate Revenue**

AT&T has a policy of placing employees with performance problems on "Performance Improvement Plans (hereinafter referred to as a "PIP"). (LaCroce Dep. 29). An employee is placed on a PIP to insure that the employee knows he or she has a problem and to insure that the employee knows the numerical goal he or she must achieve. (Lacroce Dep. 29). An employee is supposed to be placed on a PIP if he or she is under 70% of his or her year-to-date sales goal. (Lacroce Dep. 29). The determination as to whether an employee should be placed on a PIP is supposed to be made every month. (Lacroce Dep. 29). If an employee dips below 70% of his or her year to date goal, the employee has to be put on a PIP. (Lacroce Dep. 30). According to LaCroce, it is mandatory. (Lacroce Dep. 30).

The PIP, which is essentially a progressive discipline policy for underperforming salespeople, requires two to three phases (depending on an employee's tenure with the company) before and underperforming salesperson is terminated. There is evidence that younger salespeople received more favorable treatment when they failed to meet their revenue goals. In this regard, although the PIP policy was supposed to be mandatory, it was not consistently applied to younger employees. John Cibulay, was in his mid-thirties, and was significantly younger than Coccaro. (Coccaro Dep. 261). Cibulay was hired by AT&T in March, 2001 (Coccaro Dep. 261; LaCroce Dep. 54). By the end of September, 2001 (Cibulay's six month

18

mark), he had failed to sell anything. (Coccaro Dep. 99, 162; LaCroce Dep. 122; Exhibit 7).

According to AT&T's policy, Cibulay should have been placed on a PIP - - it was mandatory. (LaCroce Dep. 30). Yet, Cibulay was not placed on a PIP.

Somewhere around October, 2001 (Cibulay's seventh month), Cibulay told Coccaro that he had just made a sale and that it was nice to finally get out of the zero column. (Coccaro Dep. 144). However, Cibulay's sale was not sufficient to achieve his 70% year to date sales goal. (Exhibit 8). However, Cibulay was not placed on a PIP nor was he given a corrective action plan. In this regard, AT&T's Summary Judgment Brief states that an employee who has been with AT&T more than 6 months is supposed to receive a corrective action plan before being placed on a PIP and, in October, 2001, Cibulay crossed the 6 month threshold. There are two flaws with this reasoning:

1.  Prior to October, 2001, Cibulay was still covered by the 6 month rule (i.e., a PIP was <u>mandatory</u>). (LaCroce Dep. 30) Nevertheless, despite Cibulay's failure to sell <u>anything</u> during his first 6 months, it is undisputed that he was not placed on a PIP. In sharp contrast, Coccaro was placed on a PIP before he even reached his five month anniversary at AT&T.

2.  When Cibulay crossed the 6 month mark, AT&T's policy required AT&T to give him a corrective action letter (followed by a PIP, if he did not make his numbers). Thus, when Cibulay failed to achieve the 70% year-to-date goal in his seventh month, (October, 2001), he was supposed to be given a corrective action plan.[16] (LaCroce Dep. 29-30). Yet, he was not. As Exhibit J to AT&T's Summary Judgment Brief shows, the first time Cibulay was given a corrective letter plan was December, 2001.

    Similarly, by his eighth month (November, 2001), Cibulay had still not achieved 70% of his year-to-date goal. (Exhibit 9). Had he received the required corrective action letter in October, (which he did not), he should have been placed on a PIP

___

[16] This discussion is somewhat academic because, had AT&T placed Cibulay on a PIP during his first 6 months, as mandated by its policy, it seems clear that Cibulay would not have survived seven months.

in November.  Yet, Cibulay was not placed on a PIP nor was he given a corrective action letter, as required by AT&T's policy.  The first time Cibulay received a corrective action letter was December, 2001.[17]

In sharp contrast to Cibulay, Coccaro was placed on a PIP before he reached his fifth month anniversary at AT&T.  The evidence shows that the younger employee, Cibulay, was given more time to produce than the older employee, Coccaro.  When coupled with the fact that Cibulay, unlike Coccaro, was given a million dollar module, there is sufficient evidence to draw AT&T's explanation for firing Coccaro into question.  As a result, summary judgment should be denied.

### 3.    There is Evidence that LaCroce Hampered Coccaro's Sales Efforts

LaCroce's conduct relating to the Stolt Nielsen account provides further evidence of pretext.  At a time that Coccaro was informed that he needed to produce revenue, Coccaro told LaCroce that he had a good relationship with the VP of MIS at a company called Stolt Nielsen. (Coccaro Dep. 119, 122).  Stolt Nielsen was a large account that AT&T had been trying to penetrate for years. (Coccaro Dep. 120).  LaCroce told Coccaro that the VP of MIS was the right person to know and LaCroce told Coccaro that they would have a follow-up discussion about assigning Stolt Nielsen Coccaro. (Coccaro Dep. 120). Coccaro could not call on Stolt Nielsen unless it was assigned to him. (LaCroce Dep. 148). Later, when Coccaro followed up with LaCroce about calling on Stolt Nielsen, LaCroce told him "we will let you know when we are

---

[17]    AT&T's Brief points out that Cibulay was given various corrective action letters and placed on more than one PIP.  But the Brief fails to discuss the timing of those events.  With the exception of Cibulay's December, 2001 corrective action letter, all of Cibulay's corrective action letters and PIPs came about after Coccaro was fired and after Coccaro filed his EEOC complaint, in January, 2002.  The EEOC complaint specifically named Cibulay as a younger employee who was subjected to more favorable treatment.  (Exhibit 4, ¶ 7).

ready." (Coccaro Dep. 120). At no point, however, did LaCroce get back to Coccaro about calling Stolt Nielsen, even though Stolt Nielsen had the potential to generate a large amount of income for Coccaro and AT&T. (Coccaro Dep. 159).

LaCroce's conduct (or inaction) is evidence of pretext. AT&T had been unsuccessful in its attempts to penetrate Stolt Nielsen– a very large account. (LaCroce Dep. 150). As LaCroce testified at his deposition, Stolt Nielsen was an account with "big potential, no one had ever cracked them." (LaCroce Dep. 150). In fact, at one point, LaCroce had handled the Stolt Nielsen account himself but he could never get in there. (LaCroce Dep. 151). Stolt Nielsen could not only have generated a great deal of revenue for AT&T but it could have resulted in a large sale for Coccaro at a time that LaCroce was pressuring Coccaro to generate revenue. Yet, LaCroce never gave Coccaro permission to call the account.

There is a factual dispute over the Stolt Nielsen situation. LaCroce testified that when one of his salesmen had a connection with an account that was assigned to another salesman, LaCroce's normal practice was to call the manager of the other salesman, explain to that manager that LaCroce had a salesman with a connection to the account, and then obtain permission for LaCroce's salesman to call on that account, agreeing to some sort of revenue split in the process. (LaCroce Dep. 148-50). LaCroce did not specifically recall doing so with respect to Stolt Nielsen but assumed he did since he claims to recall giving Coccaro permission to call Stolt Nielsen. (LaCroce Dep. 148-50). It makes little sense that, at a time he was being pressured to generate revenue, Coccaro would not have called his connection at Stolt Nielsen had LaCroce given him permission to do so. Penetrating Stolt Nielsen clearly would have been a huge feather in Coccaro's cap and could have satisfied his sales quota.

Additionally, even though Coccaro's description of the situation is the one that must be credited as true on summary judgment, LaCroce's description does not have the ring of truth. After testifying that he gave Coccaro permission to call Stolt Nielsen, LaCroce could not recall whether he had any follow-up conversations with Coccaro about Stolt Nielsen or if he asked Coccaro about the progress he was making on the potential account. (LaCroce Dep. 151). It would seem logical that if LaCroce had given Coccaro permission to call on such a large account, which AT&T had not been able to penetrate for years, LaCroce would have asked Coccaro how things were progressing with Stolt Nielsen. One could expect LaCroce to follow-up with Coccaro on Stolt Nielsen if, for no other reason, to report back to the manager of the other sales territory who allegedly gave up the account in exchange for a revenue split.

The factual scenario surrounding the Stolt Nielsen situation clearly presents a question of material fact which makes summary judgment inappropriate. If a jury credits Coccaro's testimony about the Stolt Nielsen situation, the jury could rely on the *prima facie* case plus the Stolt Nielsen situation to support a finding in Coccaro's favor.

As with the Stolt Nielsen situation, there was additional evidence that LaCroce was hampering Coccaro's ability to generate revenue. While Coccaro was babysitting Trinque's accounts, he was specifically instructed not to visit some of Trinque's better accounts, including People's Bank, Beiersdorf, and American Scandia. (Coccaro Dep. 195, 200). One of Coccaro's close childhood friends did business with Beiersdorf. (Coccaro Dep. 196). Had Coccaro been allowed to visit Beiersdorf, he could have gotten into the account and met with the right person. (Coccaro Dep. 196). LaCroce's instruction not to visit some of the accounts he was babysitting for Trinque, especially Beiersdorf, hampered Coccaro's ability to generate revenue. A jury could

22

rely on this evidence to support a finding in Coccaro's favor.

Illustrating this point is the case of <u>Danzer v. Norden Systems, Inc.</u>, 151 F.3d 50 (2d Cir. 1998). In <u>Danzer</u>, the Second Circuit reversed a grant of summary judgment in an age discrimination case. In <u>Danzer</u>, the evidence showed that there was an overwhelming restructuring of the defense industry and the defendant, Norden Systems, had argued that the plaintiff had been let go because he could not generate new business. However, the plaintiff produced evidence that part of the reason he was unable to generate new business was because Norden Systems denied him funding that was necessary to do so. The Second Circuit held that such evidence was sufficient to establish pretext and avoid summary judgment. <u>Danzer</u>, 151 F.3d at 54-55. In the instant case, given the circumstances, LaCroce's response (or lack thereof) to the Stolt Nielsen situation raises suspicion as to the validity of the articulated reason for Coccaro's termination. <u>Reeves</u>, 530 U.S. at 147 ("proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). In this regard, the factual dispute over the Stolt Nielsen situation makes summary judgment inappropriate.

## IV.    <u>CONCLUSION</u>

As a result of the foregoing, defendant's motion for summary judgment should be denied on all counts.

RESPECTFULLY SUBMITTED,
THE PLAINTIFF,


By: _____/s/_____
　　　　　Robert A. Richardson
　　　　　Federal Bar No.:  ct09818
　　　　　GARRISON, LEVIN-EPSTEIN, CHIMES
　　　　　　　　& RICHARDSON, P.C.
　　　　　405 Orange Street
　　　　　New Haven, CT 06511
　　　　　Ph:  (203) 777-4425
　　　　　Fax: (203) 776-3965
　　　　　rrichardson@garrisonlaw.com




**CERTIFICATION**

　　　　I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

U.S. mail, postage prepaid, this 21st day of April, 2004 to:


Stacy Smith Walsh, Esquire
**Day, Berry & Howard, LLP**
CityPlace I - 185 Asylum Street
Hartford, CT  06103-3499


　　　　　　　_____/s/_____
　　　　　　　Robert A. Richardson

24