**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **PETER COCCARO,** | : | |
| **SR.,** | : | **CIVIL ACTION NO.:** |
| | : | |
| **Plaintiff,** | : | **3:03 CV 914 (DJS)** |
| | : | |
| **vs.** | : | |
| | : | |
| **AT&T CORPORATION,** | : | |
| | : | |
| **Defendant.** | : | **April 21, 2004** |

**PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT OF DISPUTED ISSUES OF MATERIAL FACT**

1.    The plaintiff, Peter Coccaro, was born on November 3, 1942 and is currently 62 years old.

2.    Coccaro began working for AT&T on June 25, 2001 as a Voice Account Manager in the Growth Markets Department. (Coccaro Dep. 62-63).  Initially, his supervisor was John Swarts. (Coccaro Dep. 64; LaCroce Dep. 50).

3.    For the first three months of his employment, Coccaro had to complete AT&T's training course for new employees. (Coccaro Dep. 66-70 ).   The course taught employees about the AT&T products they would be selling. (Coccaro Dep. 67).  After completing the three month training course (June, July and August), Coccaro assumed his sales duties in September, 2001. (Coccaro Dep. 70).

4.    Shortly after Coccaro completed AT&T's training course, his manager, John Swarts, was replaced and Coccaro began reporting to a different manager, Joe LaCroce. (Coccaro Dep. 78 ).

5.    LaCroce, who was in his mid-thirties at the time, (LaCroce Dep. 53), had no role in interviewing or hiring Coccaro. (LaCroce Dep. 48-49). LaCroce did not meet Coccaro until after Coccaro joined AT&T. (LaCroce Dep. 48-49).

6.    LaCroce began supervising Coccaro in September, 2001. (LaCroce Dep. 8).

7.    Immediately after LaCroce started managing the department, he met with his subordinates, including Coccaro. (Coccaro Dep. 78-79).

8.    During his first meeting with Coccaro, LaCroce told Coccaro that he should have been attempting to sell and attempting to build his customer base while he was going through AT&T's three month training course. (Coccaro Dep. 77-79). No one else at AT&T said so, however. (Coccaro Dep. 78). Indeed, Coccaro had been given a document setting forth his sales quota and the document indicated that Coccaro's sales quota during the three month training course (June, July, and August) was zero. (Exhibit 1).

9.    At&T has a practice of giving a base of customer accounts to its sales people. (Coccaro Dep. 77). In AT&T lingo, that group of base accounts is referred to as a "module." (Coccaro Dep. 77).

10.    Immediately after LaCroce became Coccaro's manager, Coccaro informed him that he had not yet received a "module." (Coccaro Dep. 79). Nevertheless, LaCroce did not give Coccaro a module. (Coccaro Dep. 262).

11.    In contrast, several of Coccaro's younger co-workers had received modules after they completed their training programs. (Coccaro Dep. 182). Younger employees in the same department as Coccaro received more favorable treatment than Coccaro in that they were assigned their own modules, whereas, Coccaro was not.

2

12.     John Cibulay, who was in his mid-thirties and substantially younger than Coccaro, had been given a module. (Coccaro Dep. 182, 261).  LaCroce testified that, after he became Cibulay's supervisor, he (LaCroce) assigned Cibulay a module.  (LaCroce Dep. 56-57).  The module consisted of one account worth one million dollars. (LaCroce Dep. 56-57).

13.     Ray Waldman was in his mid-thirties and was substantially younger than Coccaro. (Coccaro Dep. 262; LaCroce Dep. 54).  Waldman had received a module. (Coccaro Dep. 262; LaCroce Dep. 56).

14.     Dan Keenan was in his mid-forties and substantially younger than Coccaro. (Coccaro Dep. 262).  Keenan had received a module. (Coccaro Dep.  262; LaCroce Dep. 56).

15.     When John Swarts was still managing Coccaro, a sales person named Virginia Trinque took a leave of absence for surgery. (Coccaro Dep. 80).

16.     Swarts asked Coccaro if he could "babysit" Trinque's accounts during her absence. (Coccaro Dep. 81).  Swarts just wanted to make sure that nothing fell between the cracks while Trinque was out. (Coccaro Dep. 81).  This was acceptable to Coccaro because AT&T, Trinque, and Coccaro all believed that Trinque would only be out for a couple of weeks. (Coccaro Dep. 82).  The effort only required Coccaro to respond to incoming calls on Trinque's account.  (Coccaro Dep. 81).

17.     When LaCroce became Coccaro's manager, Coccaro informed LaCroce that he had been babysitting Trinque's accounts. (Coccaro Dep. 79).

18.     Thereafter, LaCroce met with Trinque and Trinque told him that she was going on a disability leave. (LaCroce Dep. 62).

19.     LaCroce informed Coccaro that Trinque's absence was going to be longer than expected. (Coccaro Dep. 82).  Yet, Coccaro continued to babysit Trinque's accounts and his involvement became more and more time consuming. (Coccaro Dep. 116-17, 198).

20.     Sixty percent of Coccaro's day was spent on the telephone and half of that time was spent dealing with Trinque's customers. (Coccaro Dep. 116-17).

21.     Once it became apparent that Trinque's absence would be prolonged and that Coccaro would be required to invest a significant amount of time on her customers, the arrangement became a problem for Coccaro. (Coccaro Dep. 116-17).

22.     Coccaro was spending time working on Trinque's accounts but not getting credit for the work. (Coccaro Dep. 194-95).  Coccaro should have been working full time on his own accounts. (Coccaro Dep. 195).

23.     Coccaro continued to ask LaCroce for his own module but was unable to obtain one.  (Coccaro Dep. 84, 262).

24.     Coccaro was under pressure from LaCroce to prospect accounts and generate revenue.

25.     In one of their first meetings, Coccaro informed LaCroce that he had a very good relationship with a high level representative at a company called Stolt Nielsen. (Coccaro Dep. 119, 122; LaCroce Dep. 145-46).  Stolt Nielsen was a large account and no one at AT&T, including LaCroce, had been able to penetrate it. (LaCroce Dep. 146-50).

26.     LaCroce told Coccaro that AT&T had been trying to get the Stolt Nielsen account for years and asked Coccaro who he knew at Stolt Nielsen. (Coccaro Dep. 120; LaCroce Dep. 145).  Coccaro told LaCroce that he knew the Vice President of Management Information

4

Systems ("MIS") and LaCroce replied "well, that is the right guy." (Coccaro Dep. 120).

27.     LaCroce told Coccaro that he thought the Stolt Nielsen account was assigned to someone else but he would see what he could do. (Coccaro Dep. 120).

28.     Since Stolt Nielsen was assigned to another salesman, Coccaro needed permission to call Stolt Nielsen, even though the other salesman had failed to make inroads with Stolt Nielsen.  (LaCroce Dep. 147-50).

29.     When Coccaro followed up with LaCroce about whether he could go after Stolt Nielsen, LaCroce told him "we will let you know when we are ready." (Coccaro Dep. 120).

30.     At no point did LaCroce get back to Coccaro.  Stolt Nielsen had the potential to generate a large amount of revenue for Coccaro and AT&T. (Coccaro Dep. 159).

31.     LaCroce's refusal to give Coccaro permission to call on Stolt Nielsen, a large account where Coccaro had a close connection, hampered Coccaro's efforts to prospect business and generate business.

32.     Similarly, while Coccaro was babysitting Trinque's accounts, he was specifically instructed not to visit some of Trinque's better accounts, including People's Bank, Beiersdorf, and American Scandia. (Coccaro Dep. 195, 200).

33.     One of Coccaro's close childhood friends did business with Beiersdorf. (Coccaro Dep. 196).  Had Coccaro been allowed to visit Beiersdorf, he could have gotten into the account and met with the right person. (Coccaro Dep. 196).  LaCroce's instruction not to visit some of the accounts that Coccaro was babysitting for Trinque hampered Coccaro's ability to generate revenue.

34.     In late October, 2001, Coccaro had a meeting with Erin Cruschel in Human Resources. (Coccaro Dep. 187-89).  Coccaro informed Cruschel that he had not been assigned a module. (Coccaro Dep. 188).  Cruschel responded with words to the effect that human resources was not the right place to raise such an issue but, instead, it should be raised with Coccaro's manager, LaCroce. (Coccaro Dep. 190).

35.     Shortly after his conversation with Cruschel, on November 9, 2001, LaCroce placed Coccaro on a Performance Improvement Plan ("PIP").  Crushel was involved in the decision to do so.  (LaCroce Dep. 105).

36.     At AT&T, an employee is supposed to be placed on a PIP if he or she is under 70% of his or her year-to-date sales goal. (Lacroce Dep. 29).

37.     The determination as to whether an employee will be placed on a PIP is supposed to be made each and every month. (Lacroce Dep. 29).  If an employee dips below 70% of his or her year-to-date goal, the employee has to be put on a PIP. (Lacroce Dep. 30).

38.     A PIP contains different phases.  (Lacroce Dep. 31). The first phase, known as Phase A, is a warning phase. (Lacroce Dep. 31).  Under Phase A, the employee is given 30 days to improve his or her performance.  (Lacroce Dep. 31).  To do so, the employee must achieve his year-to-date goal. (LaCroce Dep. 97-98, 101).  If the employee fails to do so, he or she moves to Phase B.

39.     Under Phase B of a PIP, an employee can elect from two options:  (1) try to make his or her year-to-date goal over the next 30 days or (2) use the next 30 days, with pay, to search for a job outside of AT&T. (Lacroce Dep. 31, 101).  If the employee elects option 1 but fails to achieve his or her goal, the employee is terminated.  (LaCroce Dep. 32).

40.     Employees who have been employed by AT&T longer than 6 months actually get an extra layer which, in essence, gives them two Phase A's before moving to Phase B. (Lacroce Dep. 31; Exhibit 2).  Those employees are entitled to a corrective action letter before being placed on a PIP.

41.     The PIP phases move in 30 day increments.  (LaCroce Dep. 29-31).  Thus, an employee who has been at AT&T for more than six months and dips below the 70% year-to-date mark, first gets a corrective action letter, giving him 30 days to meet his year-to-date goal. (LaCroce Dep. 29-31).  If he fails to do so, he gets placed Phase A of the PIP and gets another 30 days to meet the current year-to-date goal. (LaCroce Dep. 29-31).  Failure to do so leads to Phase B, which allows the employee to elect (1) termination and a 30 day paid job search or (2) to try to meet the current year to date goal, knowing that failure to do so will result in termination. (LaCroce Dep. 29-31).  The various phases are  mandatory. (Lacroce Dep. 30). . (Lacroce Dep. 31; Exhibit 2).

42.     Younger employees at AT&T were treated more favorably when they failed to meet their revenue goals.  In this regard, the PIP policy was inconsistently applied to Coccaro when compared to a younger salesman in the same department, John Cibulay.  Cibulay was given more time to try to generate revenue before getting placed on a PIP.  (Exhibits 5-7; LaCroce Dep. 122).

43.     As of November 9, 2001, Coccaro had been employed by AT&T for slightly under 6 months but he had not sold anything. Coccaro was placed on a PIP.

44.     Cibulay was hired by AT&T in March, 2001, three months before Coccaro. (Coccaro Dep. 261; LaCroce Dep. 54).

7

45.     For the first six months of his employment, Cibulay, failed to sell anything. (Coccaro Dep. 99, 162; LaCroce Dep. 122, Exhibits 5, 6, and 7). Yet, Cibulay was not placed on a PIP.

46.     In contrast, Coccaro was placed on a PIP before he even reached his fifth month anniversary.

47.     Cibulay was given more time to produce that Coccaro.  In this regard, Cibulay, unlike Coccaro, had been given a module worth one million dollars.  (LaCroce Dep. 56-57).

48.     In his seventh month of employment, October, 2001, Cibulay made a sale but it was not sufficient to satisfy 70% of his year-to-date quote. (Exhibit 8).   Instead, Cibulay's year-to-date attainment in October, 2001 was 17% and his monthly attainment was 33%. (Exhibit 8). Under AT&T's policy, Cibulay should have been given a corrective action letter.  (LaCroce Dep. 29-31; Exhibit 2).  However, he was not.

49.     In his eighth month, November, 2001, Cibulay had still not achieved the 70% year-to-date goal.  LaCroce did not give him a corrective action letter or place him on a PIP. (Exhibit 9).

50.     Cibulay was in his mid-thirties and significantly younger than Coccaro. (Coccaro Dep. 261).

51.     Coccaro was terminated in December, 2001.  At the time of his termination, he was 59 years old.  (Coccaro Dep. 260).

52.     The sales people in LaCroce's group handled either AT&T voice products or AT&T data products.

53.     Coccaro had handled voice products while he was employed in LaCroce's group. (LaCroce Dep. 153-55).

54.     Coccaro was given notice of termination on December 10, 2001.  On that day, Coccaro cleaned out his desk, left the building and ceased rendering services for AT&T. (Coccaro Dep. 152).

55.     Thereafter, on December 23, 2001, LaCroce brought a new salesman into his group, Hugh Sullivan. (LaCroce Dep. 153).  Within LaCroce's group, Sullivan handled AT&T voice products, as Coccaro had done. (LaCroce Dep. 153).

56.     Sullivan was younger than Coccaro.  (Exhibit 4, ¶ 8).

57.     A couple of months after Coccaro's termination, Virginia Trinque, who is approximately 12 years younger than Coccaro, (LaCroce Dep. 52), returned from her disability leave and took over the very same module that Coccaro was babysitting. (LaCroce Dep. 155).


**RESPECTFULLY SUBMITTED,
THE PLAINTIFF,**


By: _____/s/_____
      Robert A. Richardson
      Federal Bar No.:  ct09818
      GARRISON, LEVIN-EPSTEIN, CHIMES
         & RICHARDSON, P.C.
      405 Orange Street
      New Haven, CT 06511
      Ph:  (203) 777-4425
      Fax: (203) 776-3965
      rrichardson@garrisonlaw.com

## **CERTIFICATION**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

U.S. mail, postage prepaid, this 21st day of April, 2004 to:

Stacy Smith Walsh, Esquire
**Day, Berry & Howard, LLP**
CityPlace I - 185 Asylum Street
Hartford, CT  06103-3499

_____/s/_____
Robert A. Richardson