```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

   PETER COCCARO,                    :
                                     :
        Plaintiff,                   :
                                     :
   v.                                :    No. 3:03CV914 (DJS)
                                     :
   AT&T CORPORATION,                 :
                                     :
        Defendant.                   :
```

### MEMORANDUM OF DECISION

Plaintiff Peter Coccaro ("Coccaro") brings this action alleging that defendant AT&T Corporation ("AT&T") discriminated against him on the basis of his age in violation of both the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 et seq.  Count One of Coccaro's Revised Complaint alleges age discrimination in violation of the ADEA, Count Two alleges willful age discrimination in violation of the ADEA, and Count Three alleges age discrimination in violation of the CFEPA.  Now pending is AT&T's motion for summary judgment (dkt. # 54) pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons stated herein, AT&T's motion (dkt. # 54) is **GRANTED**.

## I. FACTS

On June 25, 2001, AT&T hired Coccaro as an Account Executive-Voice in its Growth Markets Department in Norwalk, Connecticut.  Coccaro was 58 years old when AT&T hired him.  During the first three months of his employment, Coccaro completed AT&T's training course, which taught new employees about the AT&T products that they would sell.  After completing the training course, Coccaro began his sales duties in September of 2001.  Coccaro's primary responsibility at AT&T was to increase AT&T's revenues through sales to businesses of specific AT&T "voice" products, including local telephone service, long distance service, calling cards, and teleconferencing.

The AT&T manager who hired Coccaro was John Swarts ("Swarts").  Swarts was initially Coccaro's supervisor, but on September 17, 2001, Joseph LaCroce ("LaCroce") replaced Swarts.  LaCroce assumed the responsibility for managing Coccaro and seven other account executives in AT&T's Norwalk office.  LaCroce was in his mid-thirties when he became Coccaro's supervisor.

Soon after account executives complete their training, AT&T often gives new account executives a base of customer accounts known as a "module."  Account executives use their modules to make sales and to identify additional sales opportunities.  Coccaro, however, was not given a module immediately after he

completed his training program, although other co-workers had received modules during or soon after their training.  Instead, Swarts asked Coccaro to look after the accounts of a sales person named Virginia Trinque ("Trinque"), who had taken a medical leave of absence.

When LaCroce became the new manager, he held meetings with the workers who were under his supervision. During Coccaro's meeting with LaCroce, Coccaro told LaCroce that he did not have his own module, but that he was looking after Trinque's accounts. Coccaro testified that LaCroce then said that he would work on getting Coccaro a module "right away" because account executives are supposed to work on their modules during training. Yet, Coccaro claims, even after his meeting with LaCroce, he never received his own module.  According to Coccaro, LaCroce, upon learning that Trinque's medical leave was going to be longer than expected, told Coccaro to continue looking after Tinque's accounts and assigned a module to a younger worker, John Cibulay ("Cibulay").  Apparently, Cibulay, who was hired by AT&T approximately three months before Coccaro, had also not received a module during, or soon after, his training.

AT&T asserts that Coccaro was, in fact, assigned his own module.  According to AT&T, when LaCroce learned that Trinque would be out on extended leave, LaCroce assigned Trinque's

-3-

accounts to Coccaro.  That is, AT&T claims that Trinque's module became Coccaro's module.  Coccaro, for his part, states that he was not aware that the module was "officially" his, and that he did not receive credit for the work done on that module.  Coccaro maintains that he was merely "babysitting" Trinque's accounts, which took up so much of his time that he could not build up his own accounts or meet his sales quotas.

Coccaro also claims that LaCroce hampered Coccaro's efforts to prospect and generate new business opportunities.  Specifically, Coccaro asserts that he had a good relationship with a high-level representative at a company called Stolt Nielsen, which, according to Coccaro, had the potential to be a large account for AT&T.  Coccaro told LaCroce about his relationship with the Stolt Nielsen representative, and he asked LaCroce if he could "go after" Stolt Nielsen.  Stolt Nielsen, however, was assigned to another AT&T salesman, who apparently had failed to make any progress with that account.  Coccaro thus wanted the opportunity to call Stolt Nielsen and work on the account, but, because it was assigned to another salesman, he needed permission to do so.  Coccaro maintains that, after he told LaCroce about the Stolt Nielsen opportunity, LaCroce never got back to him. Therefore, Coccaro asserts, LaCroce hampered Coccaro's efforts to "go after" Stolt Nielsen and make his

quotas.  Coccaro also claims that he was instructed to not visit certain accounts in Trinque's module, which he was "babysitting," and this instruction further hampered his ability to generate revenue.

Coccaro did not meet his sales quotas while working at AT&T. AT&T will place an employee on a Performance Improvement Plan ("PIP") if that employee is not on pace to meet seventy percent of his year-to-date goal.  An employee who has worked at AT&T for six months or more is given thirty days to improve his performance before being placed on a PIP; an employee who has worked at AT&T for less than six months can immediately be placed on a PIP.  A PIP has two phases, Phase A and Phase B.  Under Phase A, an employee is given thirty days to improve his performance, i.e., the employee must meet his or her year-to-date goal by the end of the thirty days.  If that employee does not meet his goal under Phase A, he moves on to Phase B.  Under Phase B, an employee can choose one of two options: (1) use the next thirty days to try to meet his year-to-date goal; or, (2) use the next thirty days, with pay, to search for a job outside of AT&T. If an employee chooses the first option under Phase B and fails to meet his year-to-date goal, AT&T will terminate his employment

at the end of that thirty-day period.[1]

On October 26, 2001, LaCroce met with Coccaro to discuss Coccaro's sales performance, which LaCroce found unsatisfactory. At that meeting, LaCroce identified those areas of Coccaro's performance that needed improvement, and both LaCroce and Coccaro developed an informal "action plan" to help Coccaro improve his sales.  Soon after the October 26, 2001 meeting, Coccaro met with Erin Cruschel ("Cruschel"), an AT&T Human Resources Representative, and informed her that he had not yet received a module.  Cruschel told Coccaro that Human Resources was not the proper department to handle this complaint, and that Coccaro should be raising this issue with LaCroce.  Approximately two weeks after the October 26, 2001 meeting, LaCroce, with Cruschel's approval, placed Coccaro on a Phase A PIP because there had been no significant improvement in Coccaro's performance.  On December 10, 2001, when the thirty-day period of Coccaro's Phase A PIP had expired, LaCroce placed Coccaro on a Phase B PIP because Coccaro had not met his goals under Phase A. Coccaro opted, under Phase B, for the thirty-day job search.  On

---

[1] There is some ambiguity regarding Coccaro's requirements for satisfying his obligations under a PIP because, at some point, AT&T changed its PIP policy, and LaCroce could not remember when this change occurred.  For the purposes of this motion, however, the policy change is not material to the court's decision.

that same day, however, Coccaro surrendered his AT&T property and ceased performing services for AT&T.  Therefore, although Coccaro received pay from AT&T until January 10, 2002, he did no work for AT&T after December 10, 2001.  On December 23, 2001, Hugh Sullivan ("Sullivan"), who is younger than Coccaro, joined LaCroce's group at AT&T.  Sullivan's arrival occurred while Cocarro was still receiving a salary from AT&T, but after Coccaro had stopped working at AT&T.

Although Coccaro does not dispute that he failed to meet his sales quotas, he claims that, because of his age, AT&T discriminated against him by (1) failing to assign a module to him while assigning modules to younger employees; (2) hampering his sales efforts; and (3) disciplining him more harshly than younger employees.  According to Coccaro, this alleged age discrimination caused Coccaro to fail at his job, thus giving AT&T a pretext to terminate his employment and hire a younger worker.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

### B. ADEA AND BURDEN-SHIFTING ANALYSIS

The ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge or otherwise discriminate against any


individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  The ADEA's prohibition against discrimination based on age protects employees who are at least forty years of age.  29 U.S.C. § 631(a).

The Second Circuit analyzes ADEA claims by using the burden-shifting framework of Title VII claims, as set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973); <u>see</u> <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001).  "First, a plaintiff must establish a <u>prima facie</u> case of age discrimination."  <u>Schnabel v. Abramson</u>, 232 F.3d 83, 87 (2d Cir. 2000).  "To establish a <u>prima facie</u> case of age discrimination, a plaintiff must show four things: (1) he is a member of the protected class; (2) he is qualified for his position; (3) he has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of age discrimination."  <u>Abdu-Brisson</u>, 239 F.3d at 466 (footnote omitted).  "The burden of establishing a <u>prima facie</u> case is not a heavy one.  One might characterize it as minimal."  <u>Carlton v. Mystic Transportation, Inc.</u>, 202 F.3d 129, 134 (2d Cir. 2000).  Once the plaintiff has established a <u>prima facie</u>

case of age discrimination,[2] "the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions." Schnabel, 232 F.3d at 87.  If, however, the employer articulates such a legitimate, nondiscriminatory business rationale, "the plaintiff has the burden of proving that his age was the real reason for his discharge." Id.  That is, "the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff." Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 91 (2d Cir. 2001); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

1. Legitimate Reason for Discharge

AT&T has satisfied its burden to articulate a legitimate, non-discriminatory reason for discharging Coccaro:  Coccaro performed his job poorly.  This burden is "one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves, 530 U.S. at 142 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S.

---

[2] Coccaro has established a prima facie case of age discrimination.  There is no dispute that Coccaro has satisfied the first three criteria to establish a prima facie case.  With respect to the fourth element, "[g]enerally, a plaintiff's replacement by a significantly younger person is evidence of age discrimination." Carlton, 202 F.3d at 135.  Here, LaCroce had Sullivan, who was significantly younger than Coccaro, fill an open position after Coccaro had stopped working at AT&T.

-10-

502, 510 (1993)).  That is, AT&T's burden is satisfied if its proffered evidence, "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action."  Carlton, 202 F.3d at 136 (quoting St. Mary's Honor Ctr., 509 U.S. at 509)(emphasis in original).  Coccaro's performance deficiencies are documented by the Account Executive Scorecards and Performance Improvement Plans that are attached to the parties' submissions, and Coccaro does not dispute that he failed to meet the requirements of his position, only the cause therefor.  AT&T has articulated a sufficient non-discriminatory reason for Coccaro's discharge.

### 2. Pretext for Age Discrimination

The burden now shifts back to Coccaro, who must produce sufficient evidence for a reasonable jury to conclude that AT&T's "proffered, non-discriminatory reason is a mere pretext for actual discrimination,"  Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d. Cir. 2000), and that "age was the real reason for [the] discharge."  Schnabel, 232 F.3d at 87.  "A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves, 530 U.S. at 148; see also Zimmermann v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)

("Reeves instructed that the combination of evidence establishing a prima facie case and evidence showing that a proffered explanation was pretextual is neither always to be deemed sufficient nor always to be deemed insufficient")(internal citations omitted).  The Second Circuit has held that Reeves "clearly mandates a case-by-case approach," Schnabel, 232 F.3d at 90, where "the ultimate issue . . . [is] whether the evidence in the record as a whole creates a reasonable inference that age was a determinative factor in the actions of which plaintiff complains," id. at 91.

Although the court must exercise caution to properly apply the governing standard set forth in Rule 56 before granting summary judgment where the employer's intent and state of mind are in dispute, see Carlton, 202 F.3d at 134,

> [i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases. . . . '[T]he salutary purposes of summary judgment–avoiding protracted, expensive and harassing trials–apply no less to discrimination cases than to . . . other areas of litigation.'

Abdu-Brisson, 239 F.3d at 466 (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).  A summary judgment motion will not be defeated by "unsupported assertions," "conjecture or surmise," or "conclusory statements."  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).  Indeed, "the Second

Circuit has . . . repeatedly affirmed grants of summary judgment in ADEA discharge cases in favor of the employer on the grounds that the record evidence was insufficient for a jury to find that the real reason behind the employee's termination was age." Choate v. Transport Logistics Corp., 234 F. Supp. 2d 125, 128 (D. Conn. 2002) (citing Slattery, 248 F.3d at 94; Schnabel, 232 F.3d at 91; James v. New York Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000)).

Coccaro argues that his evidence, which purports to demonstrate that employees outside of the protected class were treated more favorably than employees inside the protected class, is sufficient to show pretext and to sustain his burden of proof. The court, however, disagrees.  Coccaro presents no evidence demonstrating that AT&T was motivated by age animus or that AT&T considered Coccaro's age in its treatment of Coccaro, and AT&T has met its burden of proving that no material fact remains for trial.

The fact that AT&T did not assign a module to Coccaro does not, as a matter of law, permit the inference that AT&T discriminated against Coccaro because of his age.  Coccaro presents no evidence that AT&T had a policy of always assigning modules to new employees, and Coccaro does not present any evidence to show that AT&T was required to assign modules to him.

It is true that many of the employees in Coccaro's department were assigned modules, and that some AT&T employees received their modules soon after their employment began.  Contrary to Cocarro's implications, however, not all AT&T employees were assigned modules immediately after employment.  Indeed, Cibulay, to whom Coccaro frequently points as an example of a "substantially younger" employee who was treated more favorably than Coccaro, was not given a module immediately after he completed his training. In fact, Cibulay, who started working at AT&T in March of 2001, did not receive a module until LaCroce became the supervisor in September of 2001.

Further, AT&T's treatment of other employees negates any inference Coccaro seeks to draw from not receiving a module.  As previously noted, AT&T assigned the first available module in September of 2001 to Cibulay, who had been waiting three months longer than Coccaro.  Also, AT&T assigned modules to members of the protected class. Coccaro notes in his own papers that Dan Keenan ("Keenan"), a co-worker of Coccaro, was in his mid-forties and had received a module. Furthermore, based on LaCroce's deposition testimony, Trinque was in her forties when AT&T hired her, and Trinque had a module.  Although both Keenan and Trinque were younger than Coccaro when AT&T hired them, they were within the protected class, and AT&T assigned modules to them. AT&T's

-14-

conduct in assigning modules does not permit the inference that AT&T's decision to not assign a module to Coccaro was based on his age.

Coccaro's claim that LaCroce hampered Coccaro's ability to generate revenue is not enough, as a matter of law, to prove that AT&T's reasons for firing Coccaro were pretext. Coccaro asserts that he asked LaCroce for permission to call Stolt Nielsen and "penetrate" the company (i.e., set-up a large account with Stolt Nielsen), but that LaCroce never gave his permission. Apparently, another AT&T salesman, who was not under LaCroce's supervision, was assigned to handle the Stolt Nielsen account. LaCroce would need to obtain permission from the other manager in order to allow Coccaro to call Stolt Nielsen. Coccaro claims that LaCroce never got back to him about the Stolt Nielsen opportunity.[3] According to Coccaro, the result of LaCroce's inaction was the loss of potential revenue for AT&T and of a potential sale for Coccaro. Also, Coccaro maintains that LaCroce instructed him to not visit certain accounts in Trinque's module, which he was "babysitting," and that this instruction hampered Coccaro's ability to generate revenue.

Coccaro's description of events could not demonstrate

---

[3]LaCroce testified that he recalled giving Coccaro permission to call Stolt Nielsen. For the purpose of deciding this motion, the court must credit as true Coccaro's account.

pretext. Aside from conjecture by Coccaro, there is no indication that age was the motivating factor behind LaCroce's actions. With regard to Stolt Nielsen, there is no indication that similar requests were honored, or that it was customary for requests of this kind to be honored. Without any indication that his request should have been honored, Coccaro's evidence could not give rise to an inference that LaCroce was motivated by age discrimination because there is no nexus to age. With regard to LaCroce instructing Coccaro to not visit certain accounts in Trinque's module, Coccaro's own assertion is that he was only "babysitting" Trinque's module, and, as a result, the accounts in that module were not really his. Thus, there is no indication that LaCroce should have allowed Coccaro to visit those accounts. Again, absent any indication that Coccaro was entitled to visit those accounts, Coccaro's evidence here could not give rise to an inference that the motivation behind LaCroce's instruction was age discrimination.

Coccaro's assertion that AT&T disciplined him more harshly than other employees could not, as a matter of law, prove that AT&T's reason for firing him was a pretext for age discrimination. Coccaro does not dispute that he failed to meet his quotas, and this failure to perform was LaCroce's reason for firing Coccaro. That is, LaCroce, having informed Coccaro that

Coccaro needed to improve his performance, justifiably placed Coccaro on a PIP. Nevertheless, Coccaro maintains that LaCroce's disciplinary action towards him was pretext of age discrimination. To prove pretext, Coccaro states that younger employees were not similarly disciplined.

Coccaro's claim here cannot be sustained. Coccaro specifically contrasts his disciplinary treatment to Cibulay's disciplinary treatment, but Coccaro's assertions are insufficient to establish pretext. "When considering whether a plaintiff has raised an inference of discrimination by showing that [he] was subjected to disparate treatment, . . . the plaintiff must show [he] was 'similarly situated in all material respects' to the individuals with whom [he] seeks to compare [himself]." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)). In order to satisfy the "all material respects" standard for being similarly situated, "a plaintiff must show that [his] co-employees were subject to the same performance evaluation and discipline standards." Id. at 40. Additionally, the plaintiff is required "to show that similarly situated employees who went undisciplined engaged in comparable conduct." Id. As the Second Circuit has noted, "[w]hat constitutes 'all material respects' . . . varies somewhat from case to case."

Id.

Coccaro repeatedly compares himself to Cibulay, but Coccaro and Cibulay were not similarly situated in all material respects. AT&T hired Cibulay in March of 2001, whereas Coccaro started working for AT&T on June 25, 2001.  By the time Coccaro began working at AT&T, Cibulay had been an AT&T employee for a few months.  This difference is significant because AT&T had a policy of giving extra time for satisfying quotas to those employees who had been at the company for at least six months.  Coccaro counters this argument by pointing out that Cibulay, during his first six months at AT&T, did not come close to meeting his quotas, but was not placed on a PIP.  Until September of 2001, though, Cibulay's supervisor was Swarts, and not LaCroce. Coccaro wishes to compare his experience under LaCroce with Cibulay's experience under Swarts but cannot do so because he cannot show that he and Cibulay were subject to the same performance and evaluation standards.  While it is true that there was a period of time when both Coccaro and Cibulay were under Swarts's supervision, Coccaro and Cibulay were treated similarly during that time, in that neither was placed on a PIP despite the fact that both had poor sales figures.

Coccaro offers nothing else that would bolster his prima facie case or demonstrate pretext.  Assuming that Sullivan, a

younger worker, did replace Coccaro, that fact is not sufficient defeat summary judgment.  See Fagan v. New York State Electric and Gas Corp., 186 F.3d 127, 134 (2d Cir. 1999) ("The replacement of an older worker with a younger worker or workers does not itself prove unlawful discrimination."); see also Futrell v. J.I. Case, 38 F.3d 342, 348 (7th Cir. 1994) ("Typically, younger workers will replace older ones; this is an unremarkable phenomenon that does not, in and of itself, prove discrimination.").  There is no additional evidence demonstrating that AT&T was motivated by age animus.  Based on the evidence, a reasonable factfinder could not conclude that AT&T terminated Coccaro in violation of the ADEA.  Consequently, AT&T's motion for summary judgment with respect to Coccaro's ADEA claims is granted.

## C. CFEPA

Coccaro's complaint also asserts a claim arising under the CFEPA.  Connecticut courts, though, "review federal precedent concerning employment discrimination for guidance in enforcing [their] own anti-discrimination statutes."  Levy v. Commission on Human Rights and Opportunities, 236 Conn. 96, 103 (1996) (applying the burden-shifting framework in McDonnell Douglas); see Rogers v. First Union National Bank, 259 F. Supp. 2d 200, 204 (D. Conn. 2003) ("Connecticut courts look to the interpretation

of federal discrimination laws for guidance and have applied the same burden-shifting analysis of intentional discrimination brought under federal law."). Thus, the standards set forth in McDonnell Douglas apply equally to Coccaro's CFEPA claim. See Levy, 236 Conn. at 107. Accordingly, for the reasons stated above, AT&T's motion for summary judgment with respect to Coccaro's CFEPA claim is granted.

### III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (dkt. #54) is **GRANTED** with respect to the plaintiff's federal and state claims. Judgment in favor of the defendant shall enter on Counts One, Two, and Three of the complaint. The Clerk of the Court shall close this file.

So ordered this __ day of July, 2005.

                                           **/s/DJS**
                             _____
                              **DOMINIC J. SQUATRITO**
                           **UNITED STATES DISTRICT JUDGE**